404 So.2d 466 (1981)
STATE of Louisiana
v.
Tyronne LINDSEY.
No. 81-KA-0028.
Supreme Court of Louisiana.
September 8, 1981.
*469 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Abbott Reeves, Philip J. Boudousque, Asst. Dist. Attys., for plaintiff-appellee.
William Noland, Lawrence J. Boasso, New Orleans, for defendant-appellant.
BLANCHE, Justice.
Defendant Tyronne Lindsey was indicted by the Jefferson Parish Grand Jury on February 15, 1980 for the first degree murder of Earline B. Kidner, a violation of R.S. 14:30. On April 1, 1980, the defendant, attended by counsel, was arraigned and pleaded not guilty. Defendant then filed a motion to suppress his confession and to suppress any identifications made of him. The motion to suppress the confession was denied on June 20, 1980; the motion to suppress identifications was denied on the morning of trial, July 14, 1980. Trial concluded on the evening of July 15, 1980, at which time the jury returned a unanimous verdict finding the defendant guilty as charged; the same jury unanimously recommended the death penalty in the sentencing phase of the proceeding. The defendant filed a motion for a new trial on July 21, 1980, which motion was denied the same day. The defendant was then sentenced to death by electrocution. The matter is now before this Court on appeal by the defendant in which he assigns 27 errors as grounds for reversal of his conviction and sentence.

Facts
On the evening of December 19, 1979 at approximately 7:30, John Knoph and Steven Birks were preparing to exit the Oakwood Shopping Center located in Jefferson Parish. The two men had just exited the mall and were walking in the parking lot toward their car when they heard low muffled screams behind them. Sensing that something was wrong, the men began walking back toward the mall. They isolated the direction of the scream to a narrow space between two parked cars. The passenger door on one of the cars was opened and facing them. As they watched, the head of a man, later identified as that of the defendant, popped up and was visible through the passenger door window. Suddenly, the man ducked down and ran toward the back *470 of the car and then began running down the parking aisle. Then a woman, later identified as the victim, stood and ran from the same spot. Knoph, assuming the woman was not seriously injured, began running down the next aisle parallel to the man and Birks ran between parked cars to get into the same aisle as the man. The man then turned and pointed a pistol at Knoph. Knoph and Birks retired from the chase and the man escaped. When they returned to examine the woman, they discovered that she had been shot in the back.
The woman, Earline Kidner, died of a gunshot wound to the back on December 20, 1979.
Based on photographic lineup identification by Knoph, the defendant was arrested for murder. On January 3, 1980, Edward Beckendorf of the Jefferson Parish Sheriff's Office obtained a statement from Tyronne Lindsey in which he admitted his complicity in a scheme to rob Oakwood Shopping Center patrons but claimed that someone named "Sidney" shot Earline Kidner. Defendant was subsequently charged, tried and convicted as set out more fully above.
At trial, defendant presented an alibi defense, attempting to show that he was at his girlfriend's apartment on the evening of the murder.

Guilt
Argument Number 1 (Assignment of Error Number 4)
By this assignment the defendant contends that the trial court erred in denying his motion to suppress inculpatory statements. He contends that the statements were not free and voluntary and, alternatively, that they were the product of an unlawful arrest.
Voluntariness
The defendant argues that he suffers from diminished mental capacity and that, because of this, he was overcome by psychological coercion which thereby rendered his statements involuntary.
The record shows that the defendant was arrested for being a felon in possession of a firearm, R.S. 14:95.1, at 5:21 a. m. on January 3, 1980 by an officer of the New Orleans Harbor Police. He was transported to Harbor Police headquarters. The Jefferson Parish Sheriff's Office was then informed of the detention.[1]
About 9:50 a. m. on the morning of the arrest, Detective O'Neil DeNoux of the Jefferson Parish Sheriff's Office (JPSO) arrived at the Harbor Police station to question the defendant concerning the homicide. At the hearing on the motion to suppress, Detective DeNoux testified as follows: He filled out a "Rights of Arrestee or Suspect" form with biographical information about the defendant and information about the charge being investigated. He then read the form to the defendant, including each Miranda right. The defendant then printed his initials next to each listed right and signed a statement on the form which indicated that he read the statement of his rights. In addition, the defendant signed a waiver of rights contained on the same form which states that the defendant is aware of his rights and is willing to make a statement and answer questions. DeNoux then began to talk with the defendant but an unspecified interruption prevented the completion of the conversation. Thus, no statement was obtained as a result of this questioning.
At about 1:00 p. m. on the same day, Edward Beckendorf of the JPSO Robbery Division went to the Harbor Police station to further question the defendant. His testimony at the suppression hearing was essentially as follows: He personally informed defendant Lindsey of his Miranda rights. The defendant indicated to Beckendorf that he understood his rights and had no objections to Beckendorf's conversing with him further. Beckendorf then told Lindsey that the police were investigating a murder in the Oakwood Shopping Center and asked him if he knew anything about it; the defendant said "no." Shortly thereafter, *471 a detective brought one Joe Smith, an acquaintance of Lindsey, into the room where he and Beckendorf were seated. After this confrontation, Lindsey became extremely distressed and he started crying and told Beckendorf that he was being unjustly accused of murder. Beckendorf told Lindsey to relax, left the room for about fifteen to twenty minutes, then returned to find defendant still upset. At this point, Beckendorf told Lindsey that if he was being unjustly accused, he should give a statement about what he knew "so we could straighten out what actually happened concerning the murder." Lindsey indicated that he would like to tell his story whereupon Beckendorf again informed the defendant of his Miranda rights. On this occasion, Beckendorf read defendant his rights off a printed form which he asked the defendant to sign. Lindsey indicated that he could not sign it due to his inability to read or write. He then made a twenty-minute taped statement. A second statement was made a short time later.[2] Beckendorf stated that at no time was the defendant abused, threatened, or offered inducements; nor did defendant indicate that he was so distraught as to not comprehend his situation. Based on this testimony, the trial judge denied the motion to suppress the confession.
Subsequent to defendant's conviction and sentencing, Drs. Genevieve A. Arneson and Albert B. DeVillier were ordered by the trial court to examine the defendant pursuant to the preparation of a Uniform Capital Sentencing Report. Dr. Arneson found the 22 year old defendant to be illiterate except for the ability to write "a little." She noted a history of drug abuse, that the defendant's thinking was extremely simple and concrete, and hypothesized that his IQ was approximately 50. She concluded by noting that while defendant was retarded, he was able to distinguish right from wrong and could cooperate intelligently in his own defense. Dr. DeVillier found the defendant able to read and write his name and simple words. He also noted a history of drug abuse, found the defendant's thinking simple and concrete, and hypothesized that defendant's IQ was between 50 and 60. He concluded by classifying the defendant as mildly to moderately retarded, yet capable of distinguishing right from wrong and able to cooperate intelligently in his own defense.
The content of the defendant's statement introduced at trial was neither totally inculpatory nor totally exculpatory. By the use of a question and answer method, Detective Beckendorf was able to elicit from Lindsey that he had gone to Oakwood Shopping Center with three friends in order to steal a purse. Lindsey insisted that he refrained from taking any action in furtherance of the plot against the decedent. Rather, he claimed that two of his companions, one armed with a pistol, departed from the group to perpetrate a crime upon the decedent. After observing the incident and one of that pair beginning to run, the defendant claimed that he ran, too, out of fear that he would be suspected. He named as the murderer a man called Sidney.
The statement given by the defendant did not become inculpatory until it was contrasted with photographic and testimonial evidence that it would have been physically impossible for the defendant to have witnessed the events he described from the vantage point he claimed to have had while witnessing the events described. With his credibility concerning the exculpatory elements of his statement severely damaged, the only believable portion of the statement was that he was at or near the crime scene. When that was coupled with eyewitness identification of the defendant, the defendant's admission of presence near the crime scene gave added weight to the prosecution's case.
In order to use inculpatory or exculpatory statements of a defendant, stemming from custodial interrogation, the state must demonstrate the use of procedural safeguards effective to secure the privilege against self-incrimination. Miranda v. Arizona, *472 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In addition, in order for a confession or admission to be admissible, the state must prove beyond a reasonable doubt that the statement was freely, voluntarily, and intelligently made. R.S. 15:451; State v. Glover, 343 So.2d 118 (La.1977); State v. Welch, 337 So.2d 1114 (La.1976); Miranda v. Arizona, supra; see also United States v. Wertz, 625 F.2d 1128, n. 7 (4th Cir. 1980), cert. den., 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1980); United States v. Cobb, (D.S.C.1977), 448 F.Supp. 886, 893, aff'd., 568 F.2d 774 (4th Cir. 1977). Such a determination is made by reviewing the facts and circumstances of each case. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); State v. Williams, 383 So.2d 369 (La.1980). When the defendant makes specific allegations of coercion, the state cannot rely on general disclaimers that no undue influence was brought to bear upon him; rather, the state must specifically rebut such allegations. State v. Dison, 396 So.2d 1254 (La.1981); State v. Franklin, 381 So.2d 826 (La.1980). Once a trial judge has made a determination that the state has met its burden of proof, his decision is entitled to great weight on review. State v. Williams, supra; State v. Trudell, 350 So.2d 658 (La.1977); State v. White, 329 So.2d 738 (La.1976).
With respect to the relationship between diminished mental or intellectual capacity and involuntariness, this Court has noted that such a condition does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Anderson, 379 So.2d 735 (La.1980); State v. Collins, 370 So.2d 533 (La.1979); State v. Neal, 321 So.2d 497 (La.1975); State v. Nicholas, 319 So.2d 361 (La.1975); State v. Edwards, 257 La. 707, 243 So.2d 806 (1971). The state must rebut the allegation despite the fact that the defendant ordinarily bears the burden of proving mental illness, but the critical factor is still whether or not the defendant was able to understand the rights explained to him and voluntarily gave a statement. See State v. Trudell, supra; State v. Anderson, supra.
At both the hearing on the motion to suppress and trial,[3] the defendant sought to attack voluntariness only through cross-examination of Detectives DeNoux and Beckendorf. The defense called no witnesses of its own to establish any specific allegations of coercion, nor were any new issues raised in cross-examination that had not been dealt with during direct examination. On appeal, however, the defendant refers to the post-trial psychological examinations of Drs. Arneson and DeVillier in support of his claim that mental retardation vitiated voluntariness.
Even if this Court were to treat the post-trial psychological evaluations as if they were in evidence at the suppression hearing and trial and even if this Court were to assume the truth of statements contained therein, the defendant's claim of involuntariness must fall.
The evidence provided by the psychological reports does nothing more than quantify testimony in the record concerning voluntariness. Detective Beckendorf, on direct and cross-examination, testified that he was told by the defendant that Lindsey only had a third grade education and could not read or write. At trial, the defendant's parents each testified that the defendant had been a slow learner. Nevertheless, Beckendorf testified that the defendant appeared to give all of his statement voluntarily. Further, the same reports upon which the defendant relies to support his claim of mental retardation also contain the statements that he was intelligent enough to distinguish right from wrong and had the ability to cooperate intelligently in his own defense. Thus, the reports on their face tend to refute the defendant's claim that his condition hurt his ability to defend against the charges and they also are merely cumulative of that already in evidence.
*473 The question of the psychological examinations aside, the record substantiates the determination of the trial judge that the totality of the circumstances demonstrated that the defendant's statements were voluntarily and intelligently made after a waiver of known constitutional rights. Lindsey was informed of his Miranda rights at least three times during the four-hour time period prior to the giving of the statement and he had signed a written version of the same as well as a waiver of those rights. At all times he stated that he understood those rights, and he never appeared to be unable to do so. He had been given time to calm down after being confronted with upsetting information. He appeared to give his statement voluntarily. Further, Lindsey was intelligent enough to give a predominantly exculpatory statement.
For these reasons, we conclude that the trial court's ruling as to the voluntariness of the confession was supported by the evidence.
Legality of the Arrest
Defendant made his statement to a Jefferson Parish law enforcement officer after arrest by a member of the New Orleans Harbor Police. He argues that the confession must be suppressed because it was obtained by exploitation of an arrest for which there was no probable cause. This issue was not raised in the trial court; rather, it is raised for the first time on appeal. At the hearing on the motion, the only issues raised concerned the voluntariness of the confession and whether the interrogating officers adequately advised the defendant of his Miranda rights. Thus, there was no inquiry into the matter of probable cause due to defense counsel's failure to assert the illegality of the arrest below. It is well settled that a new basis for an objection may not be raised for the first time on appeal. State v. Duncan, 390 So.2d 859 (La.1980); State v. Williams, 386 So.2d 1342 (La.1980). Consequently, this Court need not reach the issue of the legality of the arrest by the Harbor Police.
This assignment is without merit.
Argument Number 2 (Assignments of Error Nos. 6 and 10)
By these assignments defendant argues that the trial court erred in denying the motion to suppress the identifications of him by state witnesses John Knoph and Richard Alexander. He also claims that the facts underlying his motion resulted in a tainted in-court identification at trial.
The validity of an identification procedure depends upon whether, judging from the totality of the circumstances, the procedure was so unnecessarily conducive to irreparable mistaken identification as to deny the accused due process of law. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Gray, 351 So.2d 448 (La.1977); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); State v. Rudolph, 332 So.2d 806 (La.1976), cert. den. 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976). When a claim is made that the identification procedure is suggestive, the identification can still stand if there is an independent basis for the identification which indicates that it is reliable. State v. Nicholas, 397 So.2d 1308 (La.1981); Manson v. Brathwaite, supra. Such factors to be considered include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the time of identification, and the time between the crime and the identification. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. State v. Nicholas, supra; Manson v. Brathwaite, supra.
Defendant claims that the photographic lineups were suggestive because (1) defendant's picture was the only one to appear in two lineups presented to Knoph, thereby increasing the chance that defendant would be picked out, regardless of guilt or innocence; (2) the color photo lineups clearly showed an alleged tatoo on defendant's forehead and, thus, singled him out.
Looking first to the specific allegations of suggestive influences, the photographs in *474 the record do not indicate a suggestive influence as the defendant claims. In the black and white photograph first selected by Knoph, the defendant has a mustache without a "goatee" and a medium "bush" type haircut. It shows no mark that can be readily identified as a tatoo. In the color photo picked out by Knoph weeks later, the defendant has a mustache and goatee, a close cropped bush haircut and a mark on his forehead just to the left of center described by the defendant as a tatoo, but actually resembling a round bruise. If anything, the dissimilarity between the two photographs negates any claim of suggestiveness based upon the fact that defendant was the only person shown twice to Knoph. Concerning defendant's second allegation, the color photo lineup viewed by Richard Alexander contains a photograph of the defendant which is identical in characteristics to the color photo shown Knoph and described above. One of the other five photographs in that lineup depicts a Negro male with a tatoo or mark on his left cheek. All of the persons have mustaches and three have goatees. Regarding the color photo lineup shown Knoph, three of the five other persons depicted appear to have mustaches and goatees. A fourth person has a mustache. Three of the five have close cropped hair. One of the five has a facial blemish in approximately the same spot as the defendant's alleged tatoo. In sum, the defendant does not appear to possess any characteristics which cause him to appear singularly different from the other persons depicted in the lineup.
Looking next to the circumstances surrounding the identification process, the defendant's claim must still fall.
At the hearing on the motion, Alexander testified that he was in the Oakwood parking lot at the time of the shooting. As he walked to his car, he heard a "zap" and turned to see someone being chased by two people. The person being chased carried a gun and ran within two and one-half car lengths of where Alexander stood.
When first questioned by police the night of the incident, Alexander stated that he did not feel as though he could identify the perpetrator since everything had happened so quickly. However, as time passed, he began to remember the events he witnessed more clearly. On January 12, 1980, approximately three weeks after the incident, he went to the police station where he was shown a lineup of six color photographs, one of which he identified the defendant as the man he saw carrying the gun. He signed the photograph he selected and identified his signature at trial. He denied that this identification was the result of any prodding by the police and also denied viewing any television reports of the defendant's arrest. He again picked out the defendant's picture during an interview with the district attorney prior to the hearing. Finally, he identified the defendant at the motion to suppress.[4]
John Knoph stated that he chased the man with the gun until the man turned and pointed the weapon at him. At that time, he saw the man's face for five to ten seconds under "good" (parking lot) lighting conditions, from a distance of approximately two car lengths. Within days of the incident, Knoph viewed "a lot of photographs."[5] On December 23, four days after the incident, Knoph was shown a series of six black and white photographs. Knoph made a tentative identification of the defendant but told Detective DeNoux that the photograph looked old and requested a newer *475 photograph. On January 3, 1980, he viewed a second set of more recent photographs, this time in color, and positively identified the defendant. Finally, he pointed at the defendant in court at the motion to suppress.
Both Alexander and Knoph identified the defendant at trial.
In sum, the witnesses' opportunity to view the defendant at the scene of the crime, the obvious attention which they focused on him at that time, the relative certainty of their identifications both pre-trial and in court, and the short span of time between the crime and the pre-trial identifications, all indicate that there was no substantial likelihood that the allegedly suggestive lineups would produce misidentifications.
These assignments are without merit.
Argument Number 3 (Assignment of Error Number 14)
By this assignment the defendant argues that the trial court committed reversible error in allowing the introduction in evidence of two allegedly prejudicial, gruesome photographs of the crime victim.
The evidence forming the basis of this assignment consists of two 8" × 10" glossy color photographs showing the nude body of the decedent lying on her back on the autopsy table. S-2 depicts the victim's head and upper torso, a trickle of dried blood streaked on her face; S-3 depicts the victim from head to knee and reveals a sutured incision made in her torso pursuant to the coroner's autopsy. In an attempt to prevent the admission of these photographs in evidence at trial, the defendant recounted his earlier admission to the correctness of the autopsy report establishing the cause of death and identity of the victim.
The test of admissibility for allegedly gruesome photographs is whether their probative value outweighs the possible prejudice that may result from their display to the jury. State v. Myles, 389 So.2d 12, on original hearing (La.1979); State v. Motton, 395 So.2d 1337 (La.1981); State v. Bodley, 394 So.2d 584 (La.1981); State v. Vernon, 385 So.2d 200 (La.1980). The evidence, of course, must be relevant for some purpose and a balance must be struck between the probativity of the photograph and its tendency "to overwhelm reason and to associate the accused with the atrocity without sufficient evidence." 4 Wigmore, Evidence § 1157 (Chadbourn rev. 1972).
Some photographs may be of such a gruesome nature that the possible prejudice that may result from their display to the jury outweighs their minor probative value. In State v. Morris, 245 La. 175, 157 So.2d 728 (1963), we found the nature of the photographs so gruesome as to overwhelm reason and cause a jury to lose sight of the need for a prosecutor to establish with sufficient independent evidence the guilt of the accused. However, photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible. State v. Bodley, supra; State v. Landry, 388 So.2d 699 (La. 1980). A stipulation to the matter sought to be proved by the photographs necessarily bears upon a balancing of the probative value of the photographs against their prejudicial effect. State v. Landry, supra; State v. Gilmore, 332 So.2d 789 (La.1976). However, the state cannot be robbed of the fair and legitimate moral force of its case merely because the stipulation is offered. State v. Harvey, 358 So.2d 1224 (La.1978); State v. Gilmore, supra. A trial court ruling concerning the admission of photographs will not be disturbed on appeal unless the prejudicial effect of the photographs, in fact, clearly outweighs the probative value. State v. Brown, 395 So.2d 1301 (La.1981); State v. Landry, supra; State v. Unger, 362 So.2d 1095 (La.1978).
Although the victim's son testified concerning the fact of death, and the defendant stipulated to the report which identified the victim and singled out the cause of death as a gunshot wound to the back, the photographs nevertheless identify the victim, corroborate the fact of death, and press home the fact that the case deals with *476 a concrete event, the killing of a flesh and blood human being. On the other hand, the photographs, while unpleasant, are not so particularly gruesome that this Court must find that they would "overwhelm reason". Neither photo depicts more blood than might result from a minor cut or nosebleed. The pictures were taken in a "sterile" environment, detached from the immediacy of the scene where the fatal injury was inflicted. In sum, when we balance the probative value of the photographs toward proving the identity of the murder victim with the small likelihood that the jury was inflamed simply upon seeing these pictures, we find that the probative value of the photographs outweighs the possible inflammatory effect. State v. Smith, 327 So.2d 355, on rehearing (La.1976).
This assignment is without merit.
Argument Number 4 (Assignment of Error Number 7)
By this assignment the defendant argues that the trial court erred in denying his request for individual voir dire of prospective jurors, and sequestration of selected jurors.
Individual Voir Dire
There is no provision of law which either prohibits or requires the sequestration of prospective jurors so as to constitute individual voir dire. See State v. Robinson, 302 So.2d 270 (La.1974); State v. Ferdinand, 285 So.2d 530 (La.1973). However, it has been suggested by this Court that a trial court has the discretion to permit individual voir dire if a defendant can demonstrate that special circumstances are present. C.Cr.P. art. 3; State v. Monroe, 397 So.2d 1258 (La.1981); State v. Robinson, supra.
The defendant argues that he need not demonstrate the presence of exceptional circumstances due to the fact that this case involves a capital offense. In effect, he argues that the fact that this case is a capital one creates a per se exceptional circumstance, without a need for a further showing. This argument is without merit and has been rejected before. See also State v. Monroe, supra. The legislature has not seen fit to establish any rule with regard to individual voir dire. Therefore, a judge should only use his inherent power to impose individual voir dire in a situation where it is necessary to ensure a fair trial for the particular defendant. In the absence of such a showing, the defendant is in no position to complain about the denial of such a request.
Individual Sequestration
As soon as each juror was accepted by the state and defendant, that juror was sworn. The trial judge, over objection, permitted those sworn jurors to remain in the courtroom while the remaining jurors were being selected. The defendant argues that the trial judge erred in failing to remove each juror from the remainder of the venire immediately upon being sworn. In support of his contention, the defendant relies upon C.Cr.P. art. 791, which provides:
"A jury is sequestered by being kept together in charge of an officer of the court so as to be secluded from outside communication.
"In capital cases, after each juror is sworn, he shall be sequestered.
"In noncapital cases, the jury shall be sequestered after the court's charge, and may be sequestered at any time upon order of the court."
In State v. McAllister, 253 La. 382, 218 So.2d 305 (1969), a capital case[6], this Court rejected an identical argument as a misconstruction of the purpose and object of the article, which provides only for keeping the jury together after selected and sworn, as well as secluded from outside communication. See also State v. Allen, 273 So.2d 504 (La.1973).
*477 The defendant adds to his argument, however, that the judge should, nevertheless, have sequestered the sworn jurors from the remainder of the venire. He contends that the failure to sequester the sworn jurors subjected them to repeatedly listening to the state's emphasis on restricting jurors who had scruples against the death penalty, thereby improperly influencing them to return a verdict of guilty. However, the defendant presents no authority for this argument, nor does he articulate the manner in which the sworn jurors would become influenced. In any event, this Court notes that each sworn juror had already indicated a willingness to impose the death penalty if the evidence warranted. Furthermore, each indicated that he or she would give the defendant an impartial trial. Under the circumstances, it does not appear that the defendant suffered any prejudice by the exposure of jurors to the voir dire of their fellow jurors.
This assignment is without merit.
Argument Number 5 (Assignment of Error Number 8)
By this assignment the defendant complains that the trial court erred in excusing two prospective primary jurors and one prospective alternate juror on the basis of their reservations about the death penalty. In particular, he argues that the trial court did not hold the jurors to the constitutional standard authorized by Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
In Witherspoon, the United States Supreme Court held that a death sentence cannot be constitutionally carried out if the jury that recommended it was chosen by excusing members of the venire for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Rather, imposition of the sentence would only be proper if such a juror was excused because he made it unmistakably clear (1) that he would automatically vote against the death sentence regardless of the evidence or (2) that his attitude toward the death penalty would prevent him from rendering an impartial verdict in the guilt phase of the prosecution. See Witherspoon, supra, footnote 21. Accordingly, C.Cr.P. art. 798(2) provides that a juror may be excused for cause on motion of the state where:
"(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; ..."
Each of the two prospective primary jurors excused indicated that he would not consider imposition of the death penalty under any circumstances, even though the first admitted that he would give the defendant a fair trial. Defense counsel was unable to get the first juror to soften his position and counsel did not even attempt to rehabilitate the second. No objection was made to the trial judge's actions in excluding the two.
With respect to the prospective alternate juror who was excused, the factual context is less clear. Prospective alternate juror Coker first indicated to the prosecutor and defense that he would oppose the death penalty regardless of what the evidence would show. Then he told defense counsel that he "guessed" he would have to uphold what the statutes of Louisiana required. Finally, he assented to a statement propounded by the trial judge that he "could not render a verdict wherein the man was to be executed." The court then excused the juror for cause. Defense counsel made no objection at that time, although he appeared to do so prior to the time he questioned Coker.[7]
*478 No objection was made to the excusing of the prospective primary jurors. In the absence of a contemporaneous objection, an alleged error or irregularity in the proceedings cannot be availed of after the verdict is rendered. C.Cr.P. art. 841; State v. Prejean, 379 So.2d 240 (La.1979); State v. Mitchell, 356 So.2d 974 (La.1978); State v. Williams, 343 So.2d 1026 (La.1977). Although an objection was made to the excusing of a prospective alternate juror, that issue is moot since the chosen alternates were excused prior to deliberations. Further, it is well established that a defendant insulated from the death penalty has no valid Witherspoon complaint. State v. George, 371 So.2d 762 (La.1979); State v. Drew, 360 So.2d 500 (La.1978); State v. Miles, 339 So.2d 735 (La.1976). Since this Court today reverses the defendant's sentence, his Witherspoon argument is moot.[8] In any event, the exclusions exercised here fall within the scope of challenges allowed by Witherspoon and C.Cr.P. art. 798(2), since all three jurors excused clearly indicated that they would vote against the imposition of the death penalty regardless of the evidence.
This assignment is without merit.
Assignments Neither Briefed Nor Argued
Assignments of error neither briefed nor argued are generally considered abandoned. State v. Sonnier, 379 So.2d 1336, on original hearing (La.1979); State v. Wientjes, 341 So.2d 390 (La.1976). However, in cases where the death penalty is imposed this Court reviews assignments of error not briefed as a matter of policy. State v. Monroe, 397 So.2d 1258 (La.1981); State v. Berry, 391 So.2d 406, on original hearing (La.1980); State v. Jones, 332 So.2d 466 (La.1976).
Assignment of Error Number 1
The defendant assigns as error the admission of hearsay testimony during the hearing on the Motion to Suppress the Identification and Confession. The testimony referred to in the assignment falls into three categories: (1) testimony concerning the circumstances under which the defendant gave his inculpatory statement; (2) testimony by John Knoph concerning the circumstances of the lineup at which he first identified the defendant as perpetrator; and (3) testimony by a police detective concerning the words and actions of John Knoph while viewing a photographic lineup.
The testimony regarding the circumstances of the confession does not disclose any hearsay. "Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." State v. Martin, 356 So.2d 1370 (La.1978). Testimony regarding the conditions under which the defendant made his statement, in the context of a pre-trial suppression hearing, does not go to the veracity of the statement given, but rather to the subjective attitude of the defendant at the time the statement was given for the purpose of establishing voluntariness.
Similarly, Knoph's direct testimony concerning his prior identification of the defendant, without citing the words of others, was relevant to prove not the truth of the prior identification, but the level of suggestion which might have entered into his decision and the degree of certainty which he felt when making the identification.
Testimony given by Detective Russell Hidding was to the effect that John *479 Knoph identified the defendant as the perpetrator of the crime on January 3, 1980. Since it was used to prove the truth of Knoph's communicative assertion, it was technically hearsay. However, the admission of the testimony does not require reversal. The hearsay nature of the statement was cured by the testimony of Knoph which corroborated the hearsay statements. See State v. Spell, supra; State v. Monroe, supra.
This assignment is without merit.
Assignment of Error Number 2
This assignment posits that the trial court erred in allowing the state to improperly use and introduce in evidence tainted photographs of the defendant and statements made by him both at the motion to suppress and trial. Most of the record referred to in this assignment has already been discussed in the context of Arguments 1 and 2, supra. However, it appears as though the defendant contends in addition that the state failed to lay a proper foundation before admitting the photographs because the photographer was not produced to identify them as his work product. It is well settled that a photograph need not be identified by the person who took it in order to be admissible in evidence. State v. Freetime, 334 So.2d 207 (La.1976). Rather, it is sufficient that the photographs illustrate a fact, shed light on any issue, or are relevant to describe the person, place or thing involved. State v. Valentine, 364 So.2d 595 (La.1978). In the present case, the various photographs were identified by state witnesses as shown to them in photographic lineups. The photographs were clearly relevant and adequately identified.
This assignment is without merit.
Assignment of Error Number 3
By this assignment defendant complains that the trial judge abused his discretion in controlling the examination of witnesses at pre-trial hearings. In particular, he complains of the trial judge's actions in overruling several of his objections to state questions and sustaining several objections to defense questions.
It is well settled that the scope and extent of cross-examination rests largely in the discretion of the trial judge; his rulings in respect thereto will not be disturbed absent an abuse of discretion. State v. George, 346 So.2d 694 (La.1977). In the present case, there is no indication that the trial court rulings were an abuse of discretion. An examination of the record indicates that his rulings were largely directed toward the exclusion of irrelevant or repetitious matter or toward the clarification of confused questioning.
This assignment is without merit.
Assignment of Error Number 5
By this assignment defendant contends that the trial court erred in denying his motion to quash and motion for a mistrial which claimed that R.S. 14:30 is unconstitutional.
In State v. Cooper, 382 So.2d 963 (La. 1980), this Court held that R.S. 14:30 is not unconstitutional.
This assignment is without merit.
Assignments of Error Numbers 9, 11 and 12
Defendant contends by these assignments that the trial court erred in permitting the state to ask leading questions and generally in granting the state too great a latitude in the examination of witnesses. Defendant also contends that the trial court was too restrictive of defense counsel's examination of witnesses. These assignments allege no specific prejudice attributable to these errors nor does this Court find any such prejudice in the record. It does not appear that any witness was induced to acquiesce in a false suggestion posed by a leading question; nor does the trial court's control of witness examination evidence an abuse warranting reversal.
These assignments are without merit.
Assignment of Error Number 13
By this assignment defendant posits that the trial court erred in allowing the introduction of hearsay testimony at trial. A review of the record indicates that the bulk of the complained of testimony was either admissible as res gestae (R. pp. 583-84) or admissions (R. pp. 656-59), R.S. 15:449. *480 The remainder of the complained of testimony at pages 525-56 was hearsay testimony which the defendant sought to introduce. In any event, the alleged error of the trial court rulings hardly prejudiced the defendant sufficiently to warrant reversal.
This assignment is without merit.
Assignment of Error Number 15
By this assignment the defendant asserts that the trial court erred in allowing the state's attorney to "disrupt" the defense closing argument and in making disparaging comments about defense counsel.
The first prosecutorial objection during defense counsel's closing argument occurred when counsel stated his perception of the state's case. Counsel stated that the state's case sought to prove murder and armed robbery. The prosecutor objected, noting that the law allows a conviction for the crime upon proof of a murder and a simple robbery. The judge then informed defense counsel that he could not give erroneous conclusions of law. Defense counsel then added that a murder committed while attempting an armed or simple robbery can also meet the definition of first degree murder. Counsel was allowed to proceed.
The second objection was made when defense counsel began to explain his viewpoint concerning the jury charges which he anticipated would be given. The prosecutor objected, claiming that defense counsel was outside the scope of permissible argument. The judge informed the jury that the argument of counsel is not the law, but allowed counsel to continue.
This Court has repeatedly disapproved of prosecutorial objection to and interruption of defense closing argument. See State v. Jones 359 So.2d 95 (La.1978); State v. Johnson, 343 So.2d 155 (La.1977). As noted in State v. Jones, supra, the state may respond to defendant's misrepresentations in rebuttal. Still, before this Court will overturn a guilty verdict for improper argument, it must be thoroughly convinced that the jury was influenced by the complained of remarks and that they contributed to the verdict. State v. Monroe, supra; State v. Berry, 391 So.2d 406, on original hearing (La.1980); State v. Light, 392 So.2d 649 (La.1980).
Defense counsel's closing argument was fairly within the scope of permissible argument. C.Cr.P. art. 774. His statement to the effect that the state attempted to prove murder and armed robbery (not simple robbery) was clearly supported by the evidence notwithstanding the technical correctness of the prosecutor's objection. And his appreciation of the jury charges appears to be a legitimate comment on the law applicable to the case. While the prosecutor's interruptions and comments were unnecessary and perhaps unfounded, however, they do not appear so egregious as to warrant reversal.
This assignment is without merit.
Assignment of Error Number 16
By this assignment, defendant asserts that the trial court erred in failing to grant his motion for a directed verdict, made at the close of the state's case. In the motion he claimed that the state failed to prove an armed robbery and a murder. The trial court responded by noting that the defendant's confession presented enough evidence of armed robbery for the matter to go to the jury.
This Court consistently held that a directed verdict is not permitted in a jury trial. State v. Brown, 395 So.2d 1301 (La.1981); State v. Gambino, 362 So.2d 1107 (La.1978); C.Cr.P. art. 778. However, in State v. Brown, supra, this Court decided to consider defendant's motion for a directed verdict as a motion for a new trial.
This Court's review of the state's case, viewed in the light most favorable to the prosecution, establishes that any rational trier of fact could have found the essential elements of the crime of first degree murder beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Brown, supra; State v. Morgan, 389 So.2d 364 (La.1980). At the very least, then, there was enough evidence to allow the case to go to the jury.
This assignment is without merit.
*481 Assignment of Error Number 17
By this assignment defendant contends that the trial court erred in refusing to charge the jury regarding attempted murder, or to instruct the jury that they could return a verdict of attempted murder.
In the instant case the defendant was charged with first degree murder. C.Cr.P. art. 814, subd. A(1) provides that the only responsive verdicts to a charge of first degree murder are: guilty; guilty of second degree murder; guilty of manslaughter; and, not guilty. Attempted first degree murder is not a legislatively provided responsive verdict.
Code of Criminal Procedure art. 807, however, does require the trial court to give a requested charge if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. Given the overwhelming facts of this case, however, the charge was not pertinent, State v. Marse, 365 So.2d 1319 (La.1979), as it would have been impossible for the jury to conclude that the most the defendant had done was attempt to commit a murder.
In any event, it is not clear how defendant may have been prejudiced by the trial court's ruling. If the jury wished to return a compromise verdict, it could have found defendant guilty of second degree murder or manslaughter. As it is, the verdict suggests that no such compromise was contemplated.
This assignment is without merit.
Assignment of Error Number 27
Prior to sentencing, the defendant argued a motion for a new trial. Two of the contentions address themselves solely to the sentencing determination, and will not be considered here. The third allegation is that there are errors patent on the record. This Court has reviewed the record and is unable to find any such errors.
This assignment is without merit.

SENTENCE REVIEW
The defendant was tried in accordance with the provisions of C.Cr.P. arts. 905-905.8, which provides for a bifurcated trial in capital cases. At the conclusion of the sentencing hearing, the jury returned a unanimous recommendation that the defendant be sentenced to death.
Article 905.9 of the Code of Criminal Procedure requires this Court to review every sentence of death to determine if it is excessive. That article also mandates this Court to establish procedures to satisfy constitutional criteria for that review. Pursuant to this authorization, this Court adopted Supreme Court Rule 28, § 1, on Review Guidelines, which provides:
"Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
"(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
"(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
The defendant assigned nine errors, of which five have been briefed, which he claims unlawfully contributed to the imposition of the death penalty in this case. In view of the fact that two of the assignments clearly have merit, only those will be considered.
Assignment of Error Number 21
The defendant contends that the death sentence was imposed under the influence of passion, prejudice or other arbitrary factors attributable to improper and inflammatory remarks made during the prosecutor's rebuttal closing argument at the sentencing hearing.
The prosecutor waived his first closing argument at the sentencing hearing, but expressly reserved his right to rebuttal argument. After defense counsel closed, the prosecutor gave the rebuttal argument which forms the basis of this assignment.
*482 The portion of the argument in question, encompassing approximately one-half of the entire argument in rebuttal, was as follows:
"... Let's talk quite candidly, let's put the law books aside. I understand how you people feel. I understand that it is a very difficult decision to make for some of you. But I ask you, there isI could, like Mr. Richard did, put the family of Mrs. Kidner on the stand and have each one of them tell you what this woman meant to her, as I'm sure if this was your wife or your mother or your sister that was the victim of this crime, I'm sure that you would probably want to take that witness stand and tell people like you your feelings. Tyronne Lindsey as he stands before you now may seem to be sorry, he may have some tears in his eyes and showing some remorse. He ain't so tough any more when he doesn't have a gun in his hand. And he ain't so tough that he's not putting a gun to a woman's back. Now that he's convicted of first degree murder, it's a different ball game. He's been cut down to size. Real tough man. Not so tough any more as he's before the Courts of law, as he stands to have his day of justice. It's not easy and I understand, but if this is not a crime that calls for the imposition of the death penalty, well then you tell me one that is. If you people don't let it be known that we are not going to stand for people going into Oakwood Shopping Center or any shopping center in this parish and wantonly and cruelly shoot anybody in the back for their pocketbook, well then what is the point of our law? Where do we stop? Where do we draw the line? It's got to be done, ladies and gentlemen, no matter how bad you may feel, and you shouldn't feel bad, because it's the right thing to do. You better believe me when I'm telling you you may be hesitant in doing it but in your heart and your mind I think each and every one of you know that it is the right thing to do. Some of you may relate to what I'm about to tell you now, some of you may not. I've said this before. When I was of draft age, and when it came up to me, whether or not I had to go into the service and go to the Vietnam war, there was a lot of opposition. And I didn't know, I didn't want to be taken out of college, and I didn't go, I was lucky, I had a high number, but I had to make that decision, and I decided that I would go; not because of whether I would lead in the cause or not but because my father went in World War Two and he gave me the option of freedom, of living in the United States, and he always told me that you have to pay a price for freedom, that this is a country that is strong and that if you want to live the life that we have here in this country, you have to be strong. That's what I'm talking about you people today, you must be strong. And why? You read about another type of war every single day in the paper. It's a war going on right now in our own streets. That's the war of crime. And sometimes I wonder who's winning. Therefore, why, why must you vote for the imposition of the death penalty? This man could be convictedhe is convicted, could be sentenced to life imprisonment. He's already had one pardon. That statute doesn't say that he cannot be pardoned, and in spite of all the cane fields and the rest that Mr. Richard was telling you about, I think you people have seen the workings of the criminal justice system, but you people have a chance that that cannot happen. But more importantly, if people like Tyronne Lindsey can commit this type of crime and not receive the penalty that is provided under Louisiana law, then when does it end? I'm sure, if that was your mother or your relative, your feelings would be in accordance with the evidence and the law and with the Kidner family."
At no time during the foregoing argument did defense counsel lodge an objection to its content. Ordinarily, this Court would find that the issue had not been preserved for review. C.Cr.P. art. 841. However, because this is a capital case and because this Court has an obligation to examine the *483 record for passion, prejudice or arbitrary factors which may have contributed to the death penalty recommendation, this Court will review the prosecutor's argument for possible reversible error. See Rule 28, supra; State v. Berry, 391 So.2d 406, on original hearing (La.1980); State v. Sonnier, 379 So.2d 1336, on rehearing (La.1980).
Argument of counsel is governed by C.Cr.P. art. 774, which provides:
"The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
"The argument shall not appeal to prejudice.
"The state's rebuttal shall be confined to answering the argument of the defendant."
This article is applicable to capital sentencing procedure by virtue of C.Cr.P. art. 905.2, which adopts, insofar as they are applicable, the general provisions of the Code of Criminal Procedure as the procedure to be followed during the sentencing phase of the bifurcated trial. See State v. Berry, supra, on original hearing.
The general rule used by this Court in deciding whether to reverse a conviction based upon improper argument is whether this Court is thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict. State v. Monroe, 397 So.2d 1258 (La.1981); State v. Berry, supra, on original hearing; State v. Light, 392 So.2d 649 (La.1980). With regard to capital sentencing review, however, this Court is not constrained by general reversible error doctrine, C.Cr.P. art. 921. The primary considerations are those stated in Rule 28, supra. Thus, while this Court may look to art. 774 to determine if argument was improper, in reviewing whether it is reversible error, this Court must look to whether the argument introduced passion, prejudice or any other arbitrary factor into the proceedings which contributed to the jury's recommendation of the death penalty. See State v. Berry, supra, Calogero, J. dissenting from denial of rehearing; State v. Sonnier, supra, on rehearing.
In State v. Berry, supra, this Court refused to set aside a death penalty merely because the prosecutor gave a standard "plebiscite on crime" rebuttal argument. In the instant case, the same result would seemingly follow the prosecutor's comment that it was time for the jury to stand up and let criminals know that it would not tolerate murder. Unlike Berry, however, the prosecutor's remarks did not end there.
The entire closing argument of the state is contained on eight transcribed pages. The portion of the argument in question, reproduced above, takes up four pages of the transcription. In the argument contained on those pages, the prosecutor made one reference to putting the law books aside, two references to the jurors implying that they should consider the victim a member of their immediate families, two references to violent crime and the war on crime, one appeal to patriotism, one reference to a prior pardon implying that pardons are not unlikely, and one reference to the criminal justice system, which the jurors purportedly had seen in operation, possibly implying that the courts tend to let murderers go free.
Whether the jury actually put the law books aside in this case is not open to serious speculation. First, the jury disregarded two aggravating circumstances argued to it by the prosecutor, namely: (1) that the offender was previously convicted of certain enumerated crimes or has a significant prior history of criminal activity, C.Cr.P. art. 905.4(c); and (2) that the offense was committed in an especially heinous, atrocious or cruel manner, C.Cr.P. art. 905.4(g). But the jury did find the existence of one aggravating circumstance not even argued before it, that the defendant knowingly created a risk of death or great bodily harm to more than one person, C.Cr.P. art. 905.4(d), apparently because the defendant pointed a pistol at John Knoph while making good his escape.[9] Second, the jury did interrupt its *484 deliberations to request the judge to inform it of the definition of life imprisonment rather than speculate using common experience and lay judgment. See Discussion, Assignment of Error Number 24, infra. Thus, it is clear that the jury did not take the prosecutor's argument at face value and that it was seriously concerned with what the law required regardless of the prosecutor's exhortations.
Under the facts of this case, it also is highly unlikely that the appeals for the jurors to consider themselves family members of the victim, to be patriotic, and to declare war on crime had any prejudicial effect. The fact that the jury requested a definition of life imprisonment during the middle of its deliberations clearly demonstrates that the jury seriously considered the imposition of that sentence rather than succumbing to emotions.
The most serious portion of the prosecutor's closing argument concerns his reference to the defendant's prior pardon to imply that one might be granted later should the defendant be sentenced to life imprisonment, thereby supporting the position that the more final punishment, death, should be imposed. Because this issue raises substantially the same issue as that forming the basis of Assignment of Error Number 24, infra, this Court will consider the prosecutor's closing argument as it is affected by the discussion of the judge's supplemental charge.
Assignment of Error Number 24
By this assignment the defendant contends that the trial court gave an erroneous or misleading response to a mid-deliberation question propounded by the jury. He claims that this interjected passion, prejudice or other arbitrary factors into the deliberation process which contributed to the recommendation of the death penalty.[10]
After the jury had retired to deliberate upon the appropriate sentence to be imposed, the jury interrupted its deliberation and made the following request of the trial judge:
"... we'd like a definition of life imprisonment please."
The following is the complete response of the trial judge:
"THE COURT:
Okay, this is the possibilities. If the jury votes for life as opposed to the death sentence, at any time from now on, the defendant could apply for a pardon or a commutation of sentence. That has to be done through the Governor's Office. He may apply for commutation after serving one-third of a life sentence, and that has beenthe most recent decision has been from eight to ten years he could apply for it, and that would be either a commutation or a pardon; and the Governor could commute the sentence to anything that he wishes to do. He could commute it to the time that he has served at the time of the application, or he could commute it to twenty years or he could commute it to or he could refuse to commute it. But he could commute it to any amount of time.
[The Prosecutor]
Your Honor, commutation, could you be more specific on what commutation is?
THE COURT:
A commutation is a reduction in the sentence. Okay? Does anybody wish to add to that? Oh, and he would also get credit for good time, if he behaves himself while he is in prison, he could even get less time than that. You know, because this doesn't say thatthe law *485 doesn't say that he can't get credit for good time while he is in jail. And good time means that if he behaves himself and he's working, he could get out in less time. So, roughly, I'd say he could be eligible after about eightfrom eight to ten years. All right? Does that answer your question? All right, thank you."
In State v. Sonnier, supra, this Court had the opportunity to deal with a similar situation. After the jury had retired for deliberation of Sonnier's sentence, the jury requested the judge to inform it whether someone sentenced to life imprisonment without benefit of parole, probation or suspension of sentence was eligible for pardon by the governor or for participation in work release programs. The jury was informed that the governor could exercise his power to pardon irrespective of the sentence imposed upon the defendant. With regard to work release eligibility, the judge read to the jury a then current statute which gave the Department of Corrections the power to establish rules governing work release of prisoners in its custody, which would have encompassed placement in universities, colleges, schools and other training programs. Since the trial judge did not have a copy of the regulations of the Department of Corrections available, he was not able to inform the jury that the regulations in fact prohibited convicted murderers from participating in the work release program. Thus, the jury was left to speculate whether the defendant might be returned to society through work release.
On appeal, this Court reversed Sonnier's death sentence and remanded for a new trial on the penalty issue. The reason for the decision was that the jury, which had previously been informed during the sentencing hearing that defendant was quite capable of renewed irrational and aggressive behavior, could have concluded that Sonnier would be eligible for work release. This was held to create juror fear, an arbitrary factor, which contributed to the sentence.
The Sonnier and instant cases have made it all too clear to this Court that the possibility of pardon or commutation is rapidly becoming a major issue in capital sentencing hearings.[11] Were this to continue unchecked, there is no doubt that the possibility of release through post conviction relief would soon be regularly placed before sentencing juries,[12] as perhaps would be the power of the legislature to lower penalties at any time. Fundamental fairness would require that juries be accurately informed of the mathematical probability of release and time frames applicable thereto in order to prevent undue speculation that would contribute to arbitrary sentence recommendations. See State v. Williams, 392 So.2d 619, on rehearing (La.1980). This would, in turn, create a whole new phase of sentencing.
The problem with the interjection of such factors into the sentencing phase is that it diverts jurors from their primary responsibility, charges them with making decisions not properly within their duty as jurors, and creates a substantial likelihood that death sentences imposed in their presence are the product of arbitrary factors.
The duty of the jury involved in a capital sentencing hearing can be gleaned from a reading of the applicable portion of the Code of Criminal Procedure. "The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender." C.Cr.P. art. 905.2. The Code requires the jury to draw its attention to considerations which aggravate the severity of the particular offense, C.Cr.P. art. 905.4, as well as those which *486 militate toward leniency, C.Cr.P. art. 905.5. After sifting through the facts and finding beyond a reasonable doubt that at least one statutory aggravating circumstance exists, the jury is entitled to determine whether the offender's life should be taken or whether the offender should be incarcerated for life without the benefit of parole, probation or suspension of sentence. C.Cr.P. art. 905.3.
Nowhere in the entire sentencing scheme does the Code provide that the sentencing jury may consider the offender's future potential for release should a life sentence be imposed. Initially, then, it appears as though the express inclusion of some factors to be considered in sentencing offenders is an implied rejection of those not mentioned. This position is bolstered in this particular case by a review of the nature of the factors included as sentencing considerations. The primary emphases at the hearing are the circumstances of the offense and the character and propensities of the offender. Speculation as to the actual length of a life sentence is not even remotely related to this goal. Still further, the Code and the statute involved give some affirmative indication that a jury should not consider the factual ramifications of a life sentence. The jury is bound to accept the law as given by the court, C.Cr.P. arts. 790, 802, and the court is bound by constitutional and statutory mandate. Concerning the penalty for first degree murder, the legislature has clearly decided that only two narrowly drawn penalties are proper for the jury to consider:[13] execution or incarceration at hard labor for the remainder of the offender's life. The jury is incapable of altering the mode of execution of either punishment or the duration of a life sentence. But giving a jury carte blanche permission to decide the potential factual consequences of a life sentence allows it to weigh the alternative not in terms of the clear meaning provided for it by the legislature, but in terms of a particular number of years versus the death penalty, thereby undermining the jury's responsibility to accept the law as given by the legislature through the court.
There are even more fundamental reasons for preventing a jury from considering the circumstances under which an offender can be released from prison although sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. All of the devices through which an offender could obtain a release from such a sentence are either mandated by the United States or Louisiana Constitutions or the Acts of Congress or of the state legislature. As an example most germane to the case at hand, we note that the Louisiana Constitution gives the governor, acting upon a recommendation from the Board of Pardons, the power to pardon crimes and commute the sentences of any persons convicted of offenses against the state. La.Const. (1974) Art. IV, § 5(E). By allowing a jury to speculate concerning what the governor might do years in the future, two problems arise. First, the interjection provokes
"... questions that no human mind can answer, and it, in substance, transposes the task of the [governor] to the jury.
"The questions are unanswerable because they rest upon future events which are unpredictable. The jury's attention may be focused, as it was here, upon whether the [governor] will release the defendant into society at some uncertain date in the future such as `eight, nine, ten years from now.' Based upon what defendant may then be, the jury is asked whether it thinks defendant should at that time be released to society. Premised upon the unknown, the question asks for an answer that cannot be intelligently rendered. The jury is precipitated into a judgment upon the imponderable." People v. Morse, 60 Cal.2d 631, 36 Cal.

*487 Rptr. 201 at 208, 209, 388 P.2d 33 at 40, 41 (1964).[14]
In addition, permitting a jury to consider the governor's possible grant of a pardon induces it to pass judgment upon the very issue entrusted only to the governor and Board of Pardons and could prevent them from deciding the issue at the proper time. See People v. Morse, supra, 36 Cal.Rptr. at p. 209, 388 P.2d at p. 41. The jury could conclude that the governor will improperly pardon dangerous offenders or commute their sentences, thereby encouraging it to pre-empt the governor's power and defeat the constitutional design by opting for the death penalty. Id., 36 Cal.Rptr. p. 209, 388 P.2d p. 41. Of course, this same rationale would be applicable to a discussion of the authority of a court of law to order a defendant's retrial or release as well as the legislature's authority to change the law.
When a jury's attention is diverted from its primary responsibility of weighing the circumstances of the crime and the character and propensities of the offender and thrust into speculation about the future actions of as yet unknown actors, a serious possibility arises that each death sentence imposed under such conditions is the result of an interjection of an unquantifiable factor into the deliberation process, thereby rendering the decision arbitrary under Rule 28, § 1(a). In addition, the journey into this speculatory exercise necessarily raises the possibility that the jury will be motivated to act out of fear of the unknown possibility that the defendant might return to society, thereby compounding the risk of arbitrariness. See State v. Sonnier, supra, on rehearing.
Although it is possible for cases to arise in which this Court can conclude that a death penalty imposed after future remedial measures are discussed at the sentencing hearing is not reversible,[15] the magnitude of the potential for arbitrary decision making and the irrelevance of future remedies to the jury's duty weigh heavily in favor of an almost blanket prohibition of the discussion of such matters. For these reasons, we hold that conditions under which a person sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence can be released at some time in the future is not a proper consideration for a capital sentencing jury and shall not be discussed in the jury's presence. Should a jury request information concerning the possibility of an offender's release, it must be informed that it is duty bound to disregard how other governmental bodies may, in their wisdom and subject to other constraints, act but, instead, must concentrate upon whether it presently feels, in light of the character of the offender and the nature of the offense, the offender should be sentenced to death or to spend the remainder of his life in prison. In reviewing a capital case in which an offender's potential for future release has been interjected into the proceedings by the state or the trial court, this Court must presume that a death sentence was imposed under the influence of an arbitrary factor unless the record clearly indicates, that the jury was properly informed of its duty and admonished to disregard the improper remark, and the record indicates that the jury heeded the admonition.
In view of the foregoing analysis, this Court must reverse the defendant's death sentence and remand for a new sentencing hearing. The prosecutor made explicit reference to the possibility of a pardon and also suggested that the court system could play some role in releasing the defendant. Likewise, the trial judge gave the jury a lengthy charge on the possibility of a pardon and commutation should the defendant be given a life sentence. At no *488 time was the jury properly instructed as to its duty or admonished to disregard these references.
For the reasons assigned, the defendant's conviction is affirmed; but defendant's sentence is vacated and the case remanded to the district court for the empanelling of a new jury for determining anew only the issue of penalty in accordance with the procedure set out in C.Cr.P. art. 905.1(B).
DIXON, C. J., concurs in the result.
MARCUS, J., concurs in part, and dissents in part and assigns reasons.
MARCUS, Justice (concurring in part and dissenting in part).
I would affirm the conviction and sentence. Accordingly, I concur in part and dissent in part.
NOTES
[1] Defendant makes an assertion in his brief that he was interrogated by the Harbor Police. However, the record contains no testimony in this regard.
[2] The trial transcript contains no reference to the content of this second statement.
[3] "In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. [citations omitted]." State v. Fischer, 380 So.2d 1340, 1342, N. 1 (La.1980).
[4] At the hearing on the motion, defense counsel orally argued that the state prompted Alexander to identify the defendant in court. This argument has no merit. The record shows that the witness stated that the assailant was "[t]his fellow on the end here." The state responded, "Are you referring to this gentleman?" and indicated the defendant. Mr. Alexander replied, "yes." This exchange does not evidence any impermissible coaching by the state.
[5] Knoph's testimony is unclear as to when he viewed these photographs. However, at the hearing, Detective DeNoux testified that Knoph viewed approximately fifty to one hundred photographs on December 20, a few days before the defendant became a suspect. DeNoux also testified that the defendant's picture was not in that display and that Knoph identified no one from that group as the assailant.
[6] The United States Supreme Court subsequently vacated McAllister's death sentence, as it was in violation of the decision rendered in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). McAllister v. La., 408 U.S. 934, 92 S.Ct. 2854, 33 L.Ed.2d 748 (1972). However, at the time the case arose the statute charged a capital offense, and the discussion of C.Cr.P. art. 791 treats the case as one.
[7] The prosecutor questioned the prospective juror Coker and elicited his opposition to capital punishment. The prosecutor immediately challenged for cause, even though the defendant had not yet had the opportunity to cross-examine Coker. The trial judge then stated, "All right, do you have any objections to excusing him for cause?" Defense counsel replied, "Yes, Your Honor, I have an objection for cause." (emphasis added) Defense counsel then questioned the witness, but never stated any objections at the time the juror was excused. Because the record is unclear, this Court will treat counsel's actions as a valid objection.
[8] Since this case is being remanded for resentencing, another jury will have to be impaneled. C.Cr.P. art. 905.1(B). It is obvious that Witherspoon is relevant to the selection of that jury.
[9] In an almost identical situation, this Court ruled that such evidence does not support a finding that the defendant created a risk of harm to more than one person. See State v. Culberth, 390 So.2d 847 (La.1980). Compare State v. Toomer, 395 So.2d 1320 (La.1981), distinguishable on several grounds.
[10] Defense counsel did not object to the supplemental charge until after the jury returned to deliberate. At present, the timeliness of this objection is not firmly established in our law. See State v. Jefferson, 379 So.2d 1389 (La. 1980); State v. Williams, 366 So.2d 1365 (La. 1978). Compare State v. Mack, 403 So.2d 8 (La.1981), on original hearing (rehearing application pending on the instant issue). However, once again this Court must act within its obligation to independently review the record for the presence of passion, prejudice or arbitrary factors. See discussion, Assignment of Error No. 21, supra.
[11] This Court also notes that in State v. Monroe, supra, defense counsel, anticipating a reference to pardons in the state's rebuttal argument, argued in his closing argument at the sentencing hearing, that his client, an indigent, would not have the "pull" to ever obtain a pardon.
[12] In the instant case, the prosecutor's rebuttal argument reference to the court system appears to be a veiled mention of this. See also State v. Myles, 389 So.2d 12, on original hearing (La.1979); State v. Berry, supra, on application for rehearing, and Calogero, J. dissenting from denial of rehearing.
[13] The penalty provision of R.S. 14:30 reads as follows:

"Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury."
[14] This cited portion of the Morse case actually dealt with the issue of whether a jury should be allowed to consider California's parole scheme during capital sentencing. However, the rationale has equal relevance to the pardon power which has been entrusted to the governor of Louisiana, and the quotation has been altered as indicated to reflect this notion.
[15] See State v. Monroe, supra; State v. Berry, supra, on application for rehearing; State v. Myles, 389 So.2d 12, on original hearing (La. 1979).