543 So.2d 886 (1989)
STATE of Louisiana
v.
Tyronne LINDSEY.
No. 87-KA-2248.
Supreme Court of Louisiana.
May 1, 1989.
Rehearing Denied June 30, 1989.
*889 William J. Guste, Jr., Atty. Gen., John Mamoulides, Dist. Atty., Dorothy Pendergast, and Guy Delaup, Asst. Dist. Attys., Louise Korns, for plaintiff-appellee.
Martha Sassone, Jefferson Indigent Defender Bd., for defendant-appellant.
CALOGERO, Justice.
Tyronne Lindsey was indicted by the Jefferson Parish Grand Jury on February 15, 1980, charged with the first degree murder of one Earline B. Kidner, a violation of La.R.S. 14:30. After a trial by jury, defendant was found guilty as charged. The same jury unanimously recommended the death sentence. Defendant appealed his conviction and sentence to this court. State v. Lindsey, 404 So.2d 466 (La.1981). We affirmed defendant's conviction but vacated his sentence because of improper statements by the prosecutor and trial judge during the sentencing phase of the trial regarding the possibility of a pardon and commutation should the defendant be given a life sentence. Defendant's case was remanded for a new sentencing hearing. On remand, a second jury unanimously recommended the death sentence. Defendant appealed to this court, which then affirmed the sentence. State v. Lindsey, 428 So.2d 420 (La.1983).
After exhausting his state remedies, defendant filed a petition for habeas corpus in the United States District Court for the Eastern District of Louisiana, alleging that the prosecution failed to disclose exculpatory material as required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The District Court denied his petition. Defendant appealed. The Court of Appeals held that a Brady violation had occurred. The State failed to disclose that an identification witness had earlier stated to the police that he would not be able to identify the perpetrator because he only saw a "silhouette." Without this statement, defendant did not have the opportunity to impeach this witness's identification testimony at trial. Defendant's conviction was reversed. Lindsey v. King, 769 F.2d 1034 (5th Cir.1985).
In April of 1987, defendant's third trial was conducted, this time with the benefit of the identification witness's prior inconsistent statement. At the conclusion of the guilt phase of his bifurcated trial, the jury found defendant guilty of first degree murder. Following the sentencing phase of the proceedings, the jury unanimously recommended the death penalty, finding that numerous statutory aggravating circumstances were applicable to the homicide.[1]
For the reasons which follow, we affirm defendant's conviction and capital sentence.

FACTS
On the evening of December 19, 1979, at approximately 7:30 p.m., John Knoph and Steven Birks were returning to their car in the parking lot of Oakwood Shopping Center. While walking to the car, the men heard low muffled screams. They stopped and walked in the direction of the screams. They observed that the screams were coming from an area between two parked cars behind an open passenger door. Not seeing anyone in the area, Knoph shouted in order to get someone's attention. At that point, the head of a man, later identified as the defendant, popped up from behind the door and ducked down again. The man ran towards the rear of the car, across the parking lot in the direction of the West Bank Expressway. At the same time, a woman stumbled from behind the car door and headed towards the shopping mall. Knoph and Birks ran after the man. The chase was witnessed by Richard Alexander and Harold Klibert, Jr. Knoph chased the man, who was separated from him by a *890 row of cars parked nose to nose on a parallel course. When the aisle of cars ended, the man stopped and pointed a gun at Knoph. Knoph also stopped and ducked down below a car when he realized he was in danger. When Knoph looked again, the man was gone. Not seeing the gun, Birks, who was behind Knoph, continued the chase, but the man escaped by crossing the Westbank Expressway. Knoph and Birks returned to the woman. She was haunched over on her knees and forearms and was crying. At that point Knoph noticed from the presence of a hole and powder burns in the woman's back that she had apparently been shot.
The woman, Earline Kidner, died of a gunshot wound to the back the following day.
Based on photographic lineup identification by Knoph, Tyronne Lindsey was arrested for murder. On January 3, 1980, Edward Beckendorf of the Jefferson Parish Sheriff's Office obtained a statement from Lindsey in which he admitted his complicity in a scheme to rob the shopping center patrons in order to get money for drugs. Defendant stated that Mrs. Kidner was killed because she harassed the person who was trying to take her purse, but that he did not rob or kill Mrs. Kidner. Defendant was subsequently charged, tried, and convicted as set out more fully above.
On this appeal of his conviction and sentence, defendant raises thirty-two (32) assignments of error.[2]

GUILT PHASE
ASSIGNMENTS OF ERROR # 1 and # 16
Assignments of error # 1 and # 16 concern certain photographs used in the photographic lineup identifications of the defendant. These photographs, although available during defendant's first trial and appellate review, were somehow lost prior to this trial, defendant's second regarding guilt and his third regarding sentence.
In the first assignment of error the defendant asserts that the trial court erred in denying his motion to quash the indictment on the grounds that "two sets of color photographs whose use preceded the arrest and subsequent indictment ... [have] not been made available to the defense," and "said photographs were in the care, custody and control of the State and their production is essential in order to satisfy the equal protection and due process requirements of defendant." The defendant argues in brief that without the photographs, he was denied the opportunity to "prepare a defense" based on misidentification of the defendant and the possibly unduly suggestive nature of the identification procedure.
This is not a frivolous contention. Essentially, the defendant is saying he had no chance to effectively impeach the testimony of the identification witnesses at trial because the jury was not able to assess the lineups for suggestiveness. The defendant is normally entitled to do this.
At a hearing on this motion, the trial judge concluded that the photographs were lost and that the prosecution had done everything in its power to locate and produce them. The trial judge denied the motion to quash and ruled that the state would not be precluded from producing evidence to support the defendant's identification at trial. For the reasons stated below, this ruling is correct.
The State did not cause the photographs to be lost. At the hearing on the motion to quash, the State called the Clerks of Court for each of the courts whereat the photographs might be misplaced. The State further called all three attorneys who defended the defendant in the earlier proceedings. No one knew where the photographs might be found. The parties stipulated at trial that "the photographs used in the identification *891 procedures were lost by the Clerk of Court's Office" (presumably, the 24th Judicial District Court's) after being admitted into evidence in another proceeding. It was further stipulated that "the photographs were not lost, misplaced, or disposed of" by either the state or the defendant.
As the hearing and the stipulation indicate, this is not a case where this court must choose between barring further prosecution or suppressing the State's most probative evidence. "The record contains no allegation of official animus towards [the defendant] or of a conscious effort to suppress exculpatory evidence." California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984). Absent a showing of bad faith, "failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, ___ U.S. ___, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988).
Pertinent to our determination that the defendant's indictment need not be quashed is the fact that this court reviewed these same photographs and the same allegations by the defendant regarding the photographs, the identification procedure, and the possibility of a tainted in-court identification at trial in the appeal of the defendant's first conviction and sentence. State v. Lindsey, 404 So.2d at 473. In that case, this court addressed the defendant's argument that the trial court erred in denying his motion to suppress the same identifications by witnesses Knoph and Alexander.
Following his first conviction, defendant argued to this court that the photographic lineups were suggestive because (1) defendant's picture was the only one to appear in two separate photographic lineups presented to Knoph, thereby increasing the chance that the defendant would be picked out, regardless of guilt or innocence; and (2) the color photo of the defendant employed in the lineups clearly exhibited a distinctive tatoo on defendant's forehead.
This court determined that the photographs, then in the record, and the identification process, were not suggestive. The court also applied the Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed. 2d 140 (1977), factors, and found that "the witnesses' opportunity to view the defendant at the scene of the crime, the obvious attention which they focused on him at that time, the relative certainty of their identifications both pre-trial and in court, and the short span of time between the crime and the pre-trial identifications, all indicate that there was no substantial likelihood that the allegedly suggestive lineups would produce misidentifications." Id. at 475.
Assignment of error # 16 also concerns the lost photographs. Defendant argues that the trial court erred in denying his motion to suppress the photographic and in-court identifications of the defendant. The motion alleges that "all of said identifications are inadmissible in evidence because they are tainted by suggestion and lack an independent source on which to base the identification."
The hearing on this motion was held, of course, without the benefit of the photographs. The defendant did, however, have the renewed opportunity to confront the police officers and witnesses who participated in the photographic lineup identifications. The motion to suppress was denied.
The motion to suppress the identification hearing preceding this trial presented substantially the same issues, witnesses and evidence as did the suppression hearing reviewed by this court following defendant's first trial. Again, there is no evidence that the photographs or the identification procedures were unduly suggestive or that they tainted the in-court identification. Accordingly, these assignments of error lack merit.
ASSIGNMENT OF ERROR # 17
By this assignment of error, the defendant contends that the trial court erred in denying his motion for production of a hat and certain other articles of clothing seized from the defendant pursuant to a search warrant. Defendant argues that this evidence was exculpatory under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and would have created a reasonable doubt as to the identity of the *892 defendant on the night of the shooting. Defendant had responded in his taped statement, which was played at trial, that he was wearing a black coat, jeans, and "a Marvin Gaye blue hat" on the night of the shooting. Defendant now contends that because no witness described the perpetrator as wearing a hat, the production of the hat would tend to impeach the testimony of those who identified defendant as the perpetrator.
At a hearing on this motion, the state testified that the articles of clothing and the hat had been disposed of in accordance with La.R.S. 15:41. That statute provides for the disposition of such property, through a court ordered destruction, two years after its seizure if it is no longer needed by the courts. The record indicates that there was compliance with the statute. At the time of the destruction, the defendant had exhausted his state remedies, although his habeas corpus petition was then pending in the U.S. 5th Circuit Court of Appeals. The trial judge denied the motion for production of the hat and clothing.
"Due process does not impose on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Arizona v. Youngblood, 109 S.Ct. at 337. As we stated in the discussion of the lost photographs, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." Id. See also California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), which states:
"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of materiality ... evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and be of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (Emphasis provided.)
Considering the standards imposed by the U.S. Supreme Court regarding the destruction of evidence, we find that the trial court correctly denied defendant's motion for production. There is no evidence in the record that the exculpatory value was apparent prior to destruction. The defendant had never made a claim to ownership of the items seized in 1980, and there is no evidence in this record that the items were used in the prior trials. The defendant could have introduced "comparable evidence" simply through the purchase of another hat, but he chose not to do so. Also, the jury heard the defendant say in the taped statement that he was wearing a "Marvin Gaye blue hat," and the defendant could have questioned the witnesses as to whether or not the man they saw the night of the shooting was wearing a hat. Accordingly, this assignment of error lacks merit.
ASSIGNMENTS OF ERROR # 15 AND # 26
By these assignments of error, the defense argues that the trial court erred in denying the motion to suppress defendant's statement and in admitting the statement into evidence over the objection of defense counsel. These assignments are not briefed,[3] but a review of the record indicates that they lack merit.
The motion to suppress defendant's statement was denied at a pre-trial hearing. In that motion, defendant urged that the statement was unlawfully and illegally obtained because he was induced to make the statement "by promises of lenient treatment *893 and by threats and the infliction of physical violence."
"In order to use an inculpatory statement of a defendant, stemming from custodial interrogation, the state must demonstrate the use of procedural safeguards to secure the privilege against self-incrimination." State v. Lindsey, 404 So.2d at 471 (citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). In addition, "before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." La.R.S. 15:451.
At the pre-trial hearing, the State called as witnesses Officers DeNoux and Beckendorf. DeNoux, the primary case officer on the Oakwood Shopping Center murder case, testified that he met the defendant at approximately 10:00 a.m. in a locker room at the Harbor Police Station. DeNoux read the defendant his Miranda rights and then had him initial and sign a Rights of Arrestee or Suspects form after again going over each of the rights. DeNoux further testified that neither he nor anyone else used any type of physical duress, coercion, or intimidation to induce defendant to sign the form, nor was the defendant offered any type of reward to sign the form. DeNoux stated that defendant did not appear intoxicated or incoherent, and that no member of the Jefferson Parish Police Department ever physically touched the defendant. Defendant spoke with DeNoux, but no statement was secured.
DeNoux asked Beckendorf to interview defendant. Beckendorf met with defendant at approximately 1:00 p.m. on the same day. Beckendorf testified that he did not see any type of physical marks on the defendant which would indicate that he had been physically roughed-up prior to the interview. Defendant was responsive, and did not appear intoxicated by drugs or alcohol. Beckendorf stated that he did not try to mentally coerce defendant in any form or fashion into giving a statement; defendant was not told that the prosecution would go easier on him if he gave the statement. Beckendorf further testified that he never physically touched defendant and that defendant was not even handcuffed.
Beckendorf's testimony indicates that defendant made two distinct statements. During the defendant's "first" statement, defendant stated that he knew nothing about the Oakwood Shopping Center murder other than what was on television. Defendant was advised by Beckendorf of his Miranda rights prior to making this statement. This statement was abruptly concluded when another detective and an acquaintance of defendant's, Joseph Smith, entered the interrogation room. At that time, defendant became upset and told Smith to leave him alone and quit telling the other officers that he had killed a lady at Oakwood Shopping Center. Defendant began crying, so Officer Beckendorf left him alone to calm down. Approximately 15 minutes later, Beckendorf elicited from the defendant the second statement referred to in this trial, so, as Beckendorf testified, the defendant could give "his side of the story." Before this statement was taken, defendant was again read his rights from a Rights of Arrestee or Suspect form. Defendant told Beckendorf he was unable to read or write so Beckendorf re-read the rights to the defendant during the taping of the statement. According to Beckendorf, defendant acknowledged his constitutional rights, waived them, and chose to give his statement.
Defendant's only witness at the pre-trial hearing on the motion to suppress his confession was himself. He testified, rather inconsistently, that he was hit on the back of the head by the Harbor Police with a shotgun prior to his arrest. He also stated that Beckendorf twisted his arm behind his back causing him pain, and that he only gave the statement so he would be left alone. He attempted to testify that he did not understand his waiver of constitutional rights because he was under the influence of drugs, but, on cross-examination, he testified that the rights were explained to him one by one, and that he was aware of the *894 rights and understood what each officer had told him prior to waiving the rights.
In denying the motion to suppress, the trial judge stated that the defendant's testimony was contrary to the state's witnesses who had nothing to gain by the defendant's arrest, and that the defendant was "highly motivated" to testify as he did. The trial judge concluded that the defendant was aware of all of the events which preceded his arrest and "realized" what he was doing before he gave the statment. We agree with these findings.
Regarding the admission of the statement into evidence at trial, we also find no error. Beckendorf repeated at trial basically the same testimony given at the pre-trial hearing (no rewards, no inducements, no promises, coercion or duress were used in order to obtain defendant's statement). Defendant did not offer any evidence of physical or mental coercion at trial. The State established proper predicates at trial for both of the statements and the trial court correctly admitted them into evidence.
ASSIGNMENTS OF ERROR # 4, # 8, # 18, # 19, AND # 24
By these assignments of error, the defendant argues that the trial court erred in admitting certain State exhibits into evidence at trial.
Assignments of Error # 4 and # 19 deal with the admission of several aerial photographs of Oakwood Shopping Center. The photographs were used during the examination of a state witness, Knoph, so that he could trace his movements on the night of the shooting. The defendant argues that the photographs were admitted without a proper foundation because Knoph had never seen an aerial photograph of Oakwood Shopping Center and, thus, could not attest to their accuracy. The trial judge initially sustained the defendant's objection, but later overruled the objection after the state elicited testimony from Knoph that the photographs were accurate depictions of the shopping mall on the night of the shooting.
"Maps or diagrams generally are admissible to aid the jury in understanding testimony if shown to be an accurate representation of the subject matter in question and the ruling of the trial court relative to admissibility will not be disturbed on appeal unless there has been an abuse of discretion." State v. Andrews, 369 So.2d 1049, 1051 (La.1979). In this case, the photographs were used to diagram the witness' movements on the night of the shooting. The witness testified that the photographs accurately depicted the shopping center as he recalled it to be on the night of the shooting and that there did not appear to be any material or substantial distortions in the photographs. We conclude that a proper foundation was laid for the introduction of the aerial photographs and that the assignments of error in this regard lack merit.
By assignments of error # 8 and # 24, defendant argues that the trial court erred in introducing into evidence three color photographs of the victim taken at the morgue. In assignment of error # 24, defendant specifically refers to Exhibit S-7. Assignment of error # 8 does not specify which of the photographs are objectionable to the defendant. S-7 is a photograph of the victim's back showing the bullet wound. S-3 is a photograph of the entire front of the victim, which was not shown to the jury. S-1 is a photograph of the victim's head and upper torso; a small amount of dried streaked blood is visible on her face. The defendant argues that the photographs are prejudicially gruesome.[4]
"It is well settled that the admission of gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their *895 probative value." State v. Kirkpatrick, 443 So.2d 546, 554 (La.1984). "Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible." Id. at 555. The photographs admitted in this case were relevant to show the identification of the victim, the manner of death, the placement of the wound, and the specific intent of the defendant to kill. It is clear that the probative value of these photographs outweighed the possible inflammatory effect.
In assignment of error # 18, the defendant argues that the trial court erred in admitting a diagram of the victim's torso depicting the placement of the wound and the angle taken by the bullet (S-6) and a copy of the coroner's report (S-8). This assignment of error is not briefed, but there is nothing in the record to indicate that the trial judge abused his discretion in admitting either the diagram or the report, as both exhibits are relevant to the instant case. This court concluded in State v. Andrews, 369 So.2d at 1050, (citing State v. Drew, 360 So.2d 500 (La.1978)), that "the rule concerning the introduction of demonstrative evidence is that the foundation laid must establish that it is more probable than not that the evidence is connected with the case and that the evidence has some relevance which the trial court considers sufficient to warrant its introduction." See also, La.R.S. 15:445 which defines relevant evidence. Accordingly, there is no merit to this assignment of error.
ASSIGNMENTS OF ERROR # 14, # 29, # 30, # 31
In these assignments of error, the defendant argues that the trial court committed numerous errors during the selection of the jury.
By assignment of error # 14 defendant complains that the trial court erred in excluding a potential juror, Luis Aguilar, who stated he had moral scruples against the imposition of the death penalty. The defendant argues that Aguilar was wrongly challenged for cause by the state under La.Crim.Proc. article 798(2)[5] because he did not manifest an inability to decide the issue of guilt or innocence impartially. The defendant further argues that the exclusion of Aguilar, by virtue of the "Witherspoon"[6] challenge, constituted a denial of his right to a jury chosen fairly from the community at large in violation of his Sixth Amendment right to have an impartial jury, and resulted in a conviction-prone jury.
"The standard for an appellate court's review of a trial court's decision to seat or reject a juror for cause is whether or not the court's finding was fairly supported by the record." State v. Jones, 474 So.2d 919, 928 (La.1985), (citing Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). La.C.Cr.P. article 798(2), which allows a challenge for cause for conscientious scruples against the infliction of capital punishment, incorporates the Witherspoon standard.[7] The Witherspoon standard was clarified by the U.S. Supreme *896 Court in Wainwright v. Witt, supra, which stated:
"The standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.... This standard does not require that a juror's bias be proved with unmistakable clarity."
In this case, prospective juror, Aguilar, responded to general questions by the trial judge that he could not consider imposing the death penalty because of "moral" scruples. Upon further questioning by the judge, Aguilar responded he could not consider the death penalty regardless of what the evidence may show. Then, upon examination by defense counsel, Aguilar stated that he could consider the death penalty if dealing with a case where a person murdered 35 elementary school children. When examined by the State, Aguilar stated that his "moral beliefs would probably take over" and he "probably would not consider" the death penalty. Defense counsel again questioned Aguilar who stated he would "obey the law" as much as he possibly could but that he was "heavy opposed to the death penalty." The judge excused the juror upon the State's challenge for cause and stated that "the court finds that he's heavily opposed to the death penalty and ... cannot consider the death penalty in this matter."
The record supports the trial judge's action in excusing this potential juror. Aguilar's testimony indicates that his views would "substantially impair the performance of his duties as a juror." Wainwright v. Witt, supra.
There is also no merit to defendant's argument that, if potential jurors are excluded under Witherspoon challenges, the resultant jury lacks impartiality and is more conviction-prone. This argument was addressed and rejected by the U.S. Supreme Court in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). See also State v. Perry, 420 So.2d 139, 143 (La.1982).[8]
In assignment of error # 29, defendant argues that the trial court erred in not dismissing the entire 50 person venire taken from the jury pool on the grounds that they may have been contaminated by the knowledge that the defendant may have been tried on a previous occasion. The alleged contamination occurred during an explanation of the presumption of innocence to the first group of six persons in the 50 person venire. (One of these six prospective jurors had already been excused for cause.) One of the five remaining prospective jurors, Arthur Johnson, interrupted and said, "Excuse me. How could he be innocent if the State has tried him already?" The trial judge responded by dismissing all of the five prospective jurors for cause who heard the remark. Defendant argues, that because knowledge on a part of a juror that the defendant had been tried on a previous occasion would clearly have a prejudicial effect on a defendant's right to a fair trial and due process of law, the trial judge should have taken further steps to ascertain how Johnson learned of the prior trial and whether or not he had discussed the prior trial with anyone in the jury pool room.
This assignment of error lacks merit. Defendant never requested dismissal of the 50 person venire, much less the entire jury pool. Defendant's request that the five prospective jurors present be excused for cause was granted. Only one juror in the next group of six had heard about the case. Out of the presence of the other five prospective jurors, he explained that he had read about the case and knew that the defendant had been convicted and was awarded a new trial. In the fifth group of prospective jurors, a gentleman was excused for cause because his friends in law enforcement had spoken about the defendant's having been convicted twice before. This explanation was also out of the presence *897 of the other prospective jurors in his group. Concerning defendant's argument that the trial judge should have asked the three excused prospective jurors if they had discussed their knowledge with any other members of the jury pool, we find it without merit. Also, defense counsel had the opportunity to question the prospective jurors as to their individual knowledge about the case and whether or not any discussion of the case had taken place in the courtroom or the jury pool room.
In assignments of error # 30 and # 31 (not argued in brief), the defendant contends that the trial judge erred in denying his challenges for cause for prospective jurors Calandro and Camp.
Defendant contends, in assignment of error # 30, that Calandro's concern about his job absence was grounds for a challenge for cause because of its effect on his ability to render a fair and impartial verdict. At the time of the trial, Calandro had worked for a life insurance company for three weeks and was being paid on straight commission. He expressed concern over possibly missing a business meeting scheduled in three days. At one point he stated he might not be able to pay attention to the evidence because of his concern over missing the meeting, but later said that he would pay attention. The state pointed out that the trial would probably be over before the meeting (and it was). The trial judge correctly denied defense counsel's challenge for cause, in that defense counsel did not establish any grounds for the challenge under C.Cr.Proc. art. 797.[9] Accordingly, this assignment of error lacks merit.
Defendant contends, in assignment of error # 31, that prospective juror, Camp's, inability to apply the presumption of innocence and the privilege against self-incrimination was grounds for a challenge for cause. Camp originally stated that "it would not bother" him if he did not hear from both sides before having to reach a verdict. Defense counsel appears to have confused Camp's response with another prospective juror's[10] response and challenged Camp. The challenge led to further questioning of Camp who attempted to tell the court that he said he "would have no problem" if the defendant did not testify. Camp again said that he would not hold the defendant's failure to testify against him. Camp did say that he "assumed" that he would hear from both sides, but he further stated he would accept the judge's instructions regarding the defendant's case. Any confusion in Camp's responses resulted from the challenge of the wrong person. In any event, Camp was more than adequately rehabilitated, so the assignment of error lacks merit.
ASSIGNMENT OF ERROR # 32
In assignment of error # 32, defendant asserts that the the jury should have been quashed on the grounds that the state used its peremptory challenges to systematically exclude blacks from the jury. Of the 50 veniremen, 9 were black. Five of the blacks were considered during voir dire. Of these five, 3 were peremptorily challenged by the State, 1 was excused by mutual consent of the State and the defendant, and 1 was challenged for cause by the defendant. The resultant jury was composed of 8 women and 4 men; 2 of the 12 jurors were of Hispanic descent.
After the jury was selected, defense counsel moved to quash the jury, pursuant *898 to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), because of the State's exercise of peremptory challenges on black jurors, specifically Mae Allen, Rosie Holmes, and Rose Davis. The prosecutor articulated reasons for excusing these three black prospective jurors, and the trial judge denied the motion to quash the jury, finding that the State's explanations were satisfactory and, further, that the exercise of the peremptory challenges was "not racially motivated." Defendant argues that the reasons submitted by the State for extending the peremptory challenges failed to rebut his prima facie case of purposeful discrimination in the selection of the petit jury.
"A defendant has no right to a petit jury composed in whole or in part of persons of his own race." Id. 106 S.Ct. at 1717 (citing Strauder v. West Virginia, 100 U.S. 303, 305, 25 L.Ed. 664 (1880)). "But the defendant does have the right to be tried by jury whose members are selected pursuant to nondiscriminatory criteria." Id. (citing Martin v. Texas, 200 U.S. 316, 321, 26 S.Ct. 338, 339, 50 L.Ed. 497 (1906)). To establish a prima facie case of purposeful discrimination under Batson, the defendant must:
"show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact ... that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.... Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen on account of their race." 106 S.Ct. at 1723.
"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." Id. The U.S. Supreme Court emphasized that "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause," and noted that "the prosecutor must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges." Id. at 1723, n. 20 (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The Court further declined to "formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." Id. 106 S.Ct. at 1724.
Assuming, without conceding, that the defendant did make a prima facie showing of purposeful discrimination, we find that this showing was adequately rebutted by the prosecutor's reasons for exercising the challenges and that the reasons are supported by the record.
Regarding prospective juror, Mae Allen, the prosecutor stated she was challenged because of her limited education (11th grade) and her inability to grasp legal issues. The prosecutor further noted that she had responded numerous times that she could not vote to impose the death penalty, although she could consider it. It was stated that her objections to the death penalty might result in her not considering it at all.
The prosecutor explained that Rosie Holmes was challenged because she initially responded that she could not convict anyone, even if the state proved its case beyond a reasonable doubt. She further had a family member convicted of murder and a son who she claims was wrongfully imprisoned following a conviction for possession of marijuana. She also stated at one point that she would "possibly, yes" resent the State in this case because of her son's treatment.
Lastly, the prosecutor stated his reasons for challenging Rose Davis. He explained that her smiling and giddishness during questioning was inappropriate. She had a difficult time articulating a response to a multiple question regarding her name, address, marital status, employment, etc., and ultimately these questions had to be asked of her one by one.
The prosecutor also expressed that Davis might disregard the institution of justice since, because of her having four children *899 without being married, she had no respect for the societal institution of marriage. Furthermore, Davis did not know if she could convict the defendant even if she was satisfied the State proved him guilty of first degree murder beyond a reasonable doubt. She expressed strong opposition to the death penalty and stated that she would not consider it. Although defense counsel elicted a response that she could be able to obey the law regarding the death penalty, she later said that she did not know if she actually could impose the death penalty.
The trial judge's finding of an absence of racial motivation in exercising the peremptory challenges is supported by the record. Accordingly, this assignment of error lacks merit.
ASSIGNMENTS OF ERROR # 2, # 3, # 5, # 6, # 7
By these assignments of error, defendant argues that numerous errors occurred during the examination of State witness, John Knoph.[11]
Under direct examination, Knoph, in explaining what he observed on the night of the shooting, testified that he shouted to get someone's attention and "Tyronne Lindsey here popped his head up." In assignment of error # 2, the defendant claims that the State failed to lay a proper foundation for the identification of the defendant by name and that the trial court erred in allowing Knoph to testify regarding this identification. Although the trial judge overruled the defendant's objection, further examination of Knoph resulted in a foundation for the identification. Knoph testified that he was 6 to 8 feet away from the victim's car when he observed the head of a black male pop up from behind the open passenger door. A chase ensued and ended when the black male stopped and pointed a gun at Knoph. Knoph testified that he looked directly at the man's face and eyes. Knoph gave a description of the man to the police and later picked him out from a photographic lineup. He identified the defendant in the courtroom as the man he saw at the scene of the crime. He stated that he learned the man's name was Tyronne Lindsey sometime after he made the photographic identification. Accordingly, this assignment of error lacks merit.
In assignment of error # 3, defendant argues that the trial court erred in allowing Knoph to testify in a narrative fashion as opposed to requiring Knoph to respond to specific questions. The trial judge sustained the defendant's initial objection and instructed the prosecutor to conduct the examination through "question and answer, please." The defendant objected again when Knoph began his answer to the question, "What else did you observe?" This objection was overruled by the trial judge, who ruled that Knoph's testimony was in response to the question asked. This assignment of error lacks merit.
In assignment of error # 5, the defendant contends that the trial judge should have granted his motion for a mistrial, alleging that the examination of Knoph included references to "at least three prior proceedings." The motion followed the following testimony:
Q. Have you seen Tyronne Lindsey since December 19, 1979?
A. Yes, I have.
Q. Where have you seen him?
A. I've seen him in this building.
Q. Did you see Tyronne Lindsey in this building in 1980?
A. Yes, I did, in December of 1980.
Q. Did you see Tyronne Linsdey in this building ...
At this point, defense counsel objected to the line of questioning, claiming Knoph was "coming dangerously close to making references to other proceedings." At the judge's bench, the prosecutor explained that he was trying to show that Knoph made an independent identification of the defendant separate and apart from the photographic lineup identification. He argued that Knoph had been instructed "not to *900 talk about another trial." The judge removed the jury and informed the prosecutor that he was making "inferences and references to other proceedings in which [Knoph] has testified in identifying the [defendant]." Then, defense counsel moved for a mistrial. The trial judge denied the mistrial, noting that defense counsel himself had stipulated earlier that there had been "another proceeding." For the following reasons, the mistrial was properly denied.
"When a conviction is reversed on appeal, our law requires that a retrial shall be conducted `with as little prejudice to either party as if it had never been tried.'" State v. Lee, 346 So.2d 682, 684 (La.1977) (citing La.C.Cr.P. art. 857). In State v. Reed, 324 So.2d 373, 380 (La.1975), this court stated that La.C.Cr.P. art. 875 was "as a minimium,... intended to mask from the jury members the fact that a defendant before them had previously been tried, with their possible conclusion that he had previously been convicted."
In this case, the remark, "in this building," did not "pin-point the defendant as being involved in the the previous trials and there was no reference to a conviction." State v. Albert, 381 So.2d 424, 428 (La.1980). There was no reference, directly or indirectly, to a prior proceeding at all. The remark, "in this building," is much more vague than that upheld by this court in State v. Albert,[12] supra. Accordingly, this assignment of error lacks merit.
In assignment of error # 6 (which was not argued in brief), defendant argues that the trial judge erred in sustaining the State's objection to the defendant's questioning of Knoph regarding time. On direct examination, Knoph testified that the defendant was the only black individual he saw in area the night of the shooting. On cross-examination, Knoph was asked by defense counsel if he could state with any certainty that no other young black men were in the shopping center the night of the murder. Knoph replied, "At what particular time? At what time are you speaking of?" Defense counsel responded, "in general while you were there that evening." The prosecutor then stated that the question needed to be defined because "in general while you were there that evening could be a space of three hours." The trial judge found the prosecutor's statement to be a proper objection. Defense counsel then objected to this ruling which the court noted. The trial judge did not abuse his discretion. This assignment of error lacks merit.
In assignment of error # 7, the defendant argues the trial judge erred in restricting the cross-examination of Knoph regarding the presence of other blacks in the parking lot on the night of the shooting. As stated in the discussion of assignment of error # 6, supra, Knoph testified that he saw no other blacks in the shopping center parking lot. During the cross-examination of Knoph, the State objected (and the objections were sustained) to the repetitive, argumentative questioning by defense counsel. For example, Knoph was asked three times about the placement of the lights in the shopping center. Then, he was asked three times about the number of people in the shopping center that night. Then, defense counsel started asking if Knoph was "being a little too particular" about not seeing any other young black men ... "you don't really remember whether you saw any young black men in the shopping center that night, do you?" Following an objection by the State, defense counsel continued, "So you can't really state with any sort of certainty that there were no other black men in that parking lot or in that shopping center that night?" The objection as to the time frame discussed in assignment of error # 6 followed this question. Defense counsel continued, "And you cannot state now with any certainty that none of those people that you saw in that parking lot before you *901 saw the assailant were young black men, can you?"
A trial judge is vested with a "sound discretion to stop the prolonged, unnecessary and irrelevant examination of a witness, whether such examination be direct or cross...." La.R.S. 15:275. The finding that defense counsel was being repetitive and argumentative is adequately supported by the record. This assignment of error lacks merit.
ASSIGNMENTS OF ERROR # 20, # 21, # 22, # 25, # 27
In these assignments of error, the defendant argues that the trial court committed errors during the State's questioning of Mr. Beckendorf.[13] These assignments of error are not argued in brief.
Defendant asserts in Assignment of Error # 25 that the trial court erred in admitting the Rights of Arrestee form over his objection that the "document is irrelevant to the predicate to the initial statement." In laying the predicate for the introduction of the defendant's first statement, Beckendorf testified that the rights read to the defendant were the same rights later read to him from the Rights of Arrestee form, however, he could not remember specifically what the rights were without looking at the form. The trial judge overruled defendant's objection because the form informed the jury as to what rights were on the form and read to the defendant prior to his first statement. The assignment of error lacks merit.
In assignment of error # 21, defendant contends the trial court should have sustained his objections regarding the questioning of Beckendorf about the Rights of Arrestee form. For the reasons assigned in assignment of error # 25, supra, this argument has no merit.
In assignment of error # 22, defendant argues that the trial court should have sustained his objections to the State's questioning of Beckendorf about the defendant's statement without first having laid a proper predicate. As we determined in the discussion of assignments of error # 15 and # 29, infra, the State established proper predicates for both of the defendant's statements. This argument has no merit.
In assignment of error # 20, the defendant contends that the trial court erroneously overruled his objection to the State's questioning of Beckendorf. Defendant does not specify in this assignment of error which of his objections should have been sustained. Our review of the record indicates that defense counsel objected two other times during the State's examination of Beckendorf. Because these objections were also overruled, we assume they are the source of assignment of error # 20. During the questioning of Beckendorf, defense counsel contended that the prosecutor was testifying. Later, defense counsel contended the prosecutor was leading the witness. The trial judge did not abuse his sound discretion in overruling these objections. Accordingly, assignment of error # 20 lacks merit.
ASSIGNMENT OF ERROR # 23
In assignment of error # 23, the defendant asserts that the trial judge erred in denying defense counsel's request for a special jury charge regarding the law of principals.
Defense counsel requested that the jury be instructed that "someone charged as a principal must be shown to have had the specific intent to kill in order to be found guilty of first degree murder." The prosecutor pointed out that "in the seven years of this case" it has never been argued that the defendant was a principal, but the State agreed to the charge "out of an abundance of caution," so the issue would not come back as a potential error on appeal. Ultimately, the following instruction on principals was given to the jury:
"You have heard testimony that more than one person was involved in the commission *902 of the crime. The parties to crimes are classified as principals and accessories after the fact. The law as to principals reads as follows.
All persons concerned in the commission of a crime, whether present or absent ... are principals. To render one guilty as a principal he must have committed the offense himself or in some way participated in the commission of a crime or he must have aided, assisted or abetted the actual perpetrator of the deed before it might be said that he was concerned in the commission of the crime.
One who aids and abets in the commission of a crime may only be charged and convicted with a higher or lower degree of crime, depending on the mental element proved at trial. Plus an individual may only be convicted as a principal for those crimes for which he has the requisite mental state.

The first degree murder statute with which this defendant is charged requires proof that this defendant had the specific intent to kill Arlene B. Kidner. It is not enough to find merely that his co-conspirator or accomplice had the necessary mental state since this intent cannot be inferred to the accused. It must also be shown that this defendant had the specific intent to kill. (Emphasis added.)
Our review of the record indicates that the trial judge gave the requested instruction and correctly informed the jury as to the law of principals. Accordingly, the assignment of error lacks merit.
ASSIGNMENT OF ERROR # 13
In assignment of error # 13, defendant contends that the evidence against him was insufficient to justify the verdict. Defendant argues that the State failed to introduce any direct evidence of specific intent on the defendant's part and that the inference derived from the circumstantial evidence which was presented did not amount to proof beyond a reasonable doubt. It is further argued that the State's evidence, at most, demonstrated a violation of La.R.S. 14:30.1(A)(2), second degree murder resulting from the killing of a human being while the offender is engaged in the perpetration of an armed robbery even though he has no intent to kill or to inflict great bodily harm.
"The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... [is] whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979). A court is not required to determine whether it believes the evidence at trial established guilt beyond a reasonable doubt, but rather, whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319, 99 S.Ct. at 2789.
"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act." La.R.S. 14:10(1). Although "intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction." La.R.S. 15:445. Circumstantial evidence must "exclude every reasonable hypothesis of innocence." La.R.S. 15:438.
For the reasons which follow, we conclude that a rational trier of fact could have found the essential element of specific intent beyond a reasonable doubt to support a conviction of first degree murder.
The State's evidence indicated that the victim was shot in the back from a distance of three to six inches. The State also introduced the statement of the defendant recorded by Officer Beckendorf wherein the defendant said that he and others planned to steal a pocketbook from an Oakwood Shopping Center patron to get money to buy drugs and that the group had a pistol. Defendant further stated that the victim was killed because she harassed the person trying to take her purse. Several witnesses heard the victim's screams and saw a young black male run from the scene. John Knoph, one of the witnesses, testified that he chased the male and looked him *903 directly in the face and eyes. Knoph further testified that the male was pointing a .22 caliber handgun at him. (A pathologist testified that a .22 caliber slug was found in the victim's body.) Knoph gave a description of the man to the police at the scene and his photographic identification led to the defendant's arrest. Knoph made an in-court identification and testified that he had no doubt that the defendant was the black male he confronted in the parking lot on the night of the victim's death. Another witness at the scene also identified the defendant as the man in the parking lot.
In his statement, defendant first said he knew nothing about the murder, except what he had seen on television. He later said that he indeed was involved in the robbery scheme which resulted in the victim's death. He admitted he was at the shopping center and that he had possession of the gun two days before. He stated that the woman probably came out of K & B Drug Store and that he was standing at McKenzie's Bakery. While he first said he did not see anything, he later correctly described the victim's hair color and the color of her car. These were not viewable from where defendant alleged he was standing when the murder occurred.
Considering the close range of the shooting, the scheme to steal money for drugs, Knoph's identification of the defendant as the man at the scene of the crime and fleeing the scene while carrying a gun and defendant's own statement placing him at the shopping center and containing a description of the victim and her car which was not ascertainable from where he alleged he was standing when the murder occurred, the evidence supports the jury's finding of a specific intent to kill or inflict great bodily harm during the commission of an armed robbery. Accordingly, the assignment of error lacks merit.

PENALTY PHASE

SENTENCE REVIEW
Supreme Court Rule 28 and La.C.Cr.P. art. 905.9 require that this court review every death sentence to determine whether the sentence is unconstitutionally excessive. The determination is made after the Court considers whether the sentence was imposed under the influence of passion, prejudice, or arbitrary factors; whether the evidence supports the finding of a statutory aggravating circumstance; and whether the sentence is disproportionate to the penalty imposed in other cases considering both the offense and the offender.

PASSION, PREJUDICE, ARBITRARY FACTORS
Defendant is black; his victim was white. No members of the defendant's race served on the jury; however, there was no indication that racial motivation was present in the selection of the jury. See assignment of error # 32, supra. The defendant assigned and briefed two errors which he claims contributed to the imposition of the death penalty in this case.
ASSIGNMENT OF ERROR # 9
In assignment of error # 9, defendant contends that he was denied his right to a reliable and responsible determination of his sentence, as guaranteed by the 8th and 14th amendments, because that determination was made by a jury which was unaware of its ultimate responsibility for imposing a sentence of death. Defendant makes three arguments to support this contention: (1) the jury was instructed that its decision to impose the death penalty was merely a recommendation, (2) the jury was misled by verdict forms which used the word "recommendation," (3) the trial judge did not instruct the jury that their "recommendation" would be binding on the court. These arguments lack merit.
A capital sentencing jury must "recognize the gravity of its task and proceed with the appropriate awareness of its truly awesome responsibility." Caldwell v. Mississippi, 472 U.S. 320, 341, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985). There is no evidence in the record in this case to support the defendant's contention that the jury was left with the mistaken impression that the ultimate responsibility for determining the death sentence did not lie with them. The trial judge told the jurors at the *904 beginning of the penalty phase of the trial that they had the "authority to make a bonding [sic] recommendation to the trial judge as to the sentence that shall be imposed upon the defendant." Later, the trial judge instructed the jury that they "must now determine whether the defendant should be sentenced to death or life imprisonment.... It is your responsibility in accordance with the principles of law I have instructed you to determine whether the defendant should be sentenced to death or life imprisonment...." Also, the use of the word "recommendation" on the verdict form comports with statutory provisions governing capital proceedings. See La.C. Cr.P. articles 905.6 and 905.7.[14]
Accordingly, this assignment of error lacks merit.
ASSIGNMENT OF ERROR # 10
In assignment of error # 10, defendant argues that he was denied a reliable sentencing determination because the trial judge failed to "clearly and explicitly" inform the jury of its option to impose a life sentence even if it found the existence of one or more aggravating circumstances.
The trial judge made the following pertinent statements:
"All right ladies and gentlemen, you must now determine whether the defendant should be sentenced to death or life imprisonment.... You are required to consider the existence of aggravating and mitigating circumstances in deciding which sentence should be imposed.... If you find beyond a reasonable doubt that any of the aggravating circumstances existed, you may consider imposing a sentence of death.... Even if you find the existence of the aggravating circumstance, you must also consider any mitigating circumstance before you decide that a sentence of death should be imposed.... In addition to those specifically provided mitigating circumstances, you must also consider any other relevant mitigating circumstance.... You may consider any other relevant circumstances which you feel should mitigate the severity of the penalty to be imposed.
In order to satisfy the requirements of the 8th and 14th amendments of the U.S. Constitution, a capital sentencing instruction must "clearly guide a jury in its understanding of mitigating circumstances and their purpose and the option to recommend a life sentence although aggravating circumstances are found." Goodwin v. Balkcom, 684 F.2d 794 (11th Cir.1982). In this case, when the general charge is considered in its entirety, "the jury could hardly have failed to understand that there were two sentencing alternatives, one of which could only be imposed after a unanimous finding of at least one aggravating circumstance, and that the function of the mitigating circumstances was to `mitigate the severity of the penalty to be imposed.'" State v. Jones, 474 So.2d 919, 933 (La. 1985). Accordingly, this assignment of error lacks merit.
Our review of the record reveals no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death sentence.

AGGRAVATING CIRCUMSTANCES
Jurors found the existence of three aggravating circumstances: (1) the offender was engaged in the perpetration of an armed or simple robbery; (2) the offender knowingly created a risk of death or great bodily harm to more than one person; (3) the offense was committed in an especially heinous, atrocious, or cruel manner.
The record fully supports the jury's finding that the killing occurred during the commission of an armed or simple robbery. The State presented evidence that the victim was shot in the back at point-blank range. It also introduced defendant's statement in which the defendant said that he and others went to the Oakwood Shopping Center to get money in order to buy drugs. When the victim refused to turn *905 over her purse, she was shot. Several witnesses heard the victim's screams and saw a single black male, later identified as the defendant, running from the victim and fleeing the scene. The black male was carrying a gun. When viewed in the light most favorable to the prosecution, a rational juror could have found beyond a reasonable doubt that the defendant was the gunman and that the killing was done during the commission of an armed robbery.
Since the jury properly found at least one statutory aggravating circumstance (that defendant was engaged in the perpetration of an armed robberyLa.C. Cr.P. art. 905.4(A)(1)), a circumstance clearly supported by the record, we find it unnecessary to decide whether the jury erred in finding two additional aggravating circumstances. A sentence of death can be imposed as long as the jury finds the existence of "at least one statutory aggravating circumstance" beyond a reasonable doubt. La.C.Cr.P. 905.3. It is unnecessary for all aggravating factors found by the jury to be present. State v. Narcisse, 426 So.2d 118, 138 (La.1983); State v. Moore, 414 So.2d 340 (La.1982).
ASSIGNMENT OF ERROR # 11
In assignment of error # 11, defendant states that his death sentence must be vacated because it was based on the finding of an "invalid" aggravating circumstance, in that it repeats an element of the crime of first degree murder. Defendant was convicted of first degree murder for a killing which occurred during an armed robbery. The jury then imposed the death sentence, finding the existence of three aggravating circumstances, one of which was that the defendant was engaged in the perpetration or attempted perpetration of an armed or simple robbery. Defendant argues that the "repetition of an element of the crime as an aggravating circumstance" for consideration in imposing the death penalty ("double counting") violates the 8th Amendment by increasing the risk that the jury will impose the death penalty arbitrarily. He urges that if the double-counted aggravating circumstance is indeed invalid, the death sentence must be vacated because it is impossible to determine whether the two other aggravating circumstances found by the jury, when weighed against the mitigating factors presented, would have supported a death sentence determination.
There is no merit to either of the defendant's arguments. "The well-settled rule in Louisiana is that we do not apply a balancing of aggravating and mitigating circumstances" in the capital sentencing scheme. State ex rel. Busby v. Butler, 538 So.2d 164 (La.1988). Second, the "double counting" of an element of the crime of First Degree Murder as an aggravating circumstance in determining the penalty to be imposed is not unconstitutional. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
As the evidence is sufficient to support one of the aggravating circumstances, the sentence recommended by the jury will not be set aside.

PROPORTIONALITY
Finally, we must determine whether the sentence in this case is disproportionate to the penalty imposed in similar cases. While the United States Supreme Court has now held that proportionality review is neither constitutionally mandated, nor required, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), such review is required under this state's statutory scheme. La.C.Cr.P. art. 905.9.1(1)(c). When conducting this review, we consider both the nature of the crime and the defendant.
ASSIGNMENT OF ERROR # 28
In assignment of error # 28, defendant contends that strong evidence of mitigating circumstances was presented to the jury, the most controlling being that at the time of the offense, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of a mental defect (i.e., mental retardation). The defendant contends that his death sentence must be vacated because *906 the jury did not properly weigh and consider this evidence. Defendant further argues that the death sentence is excessive and should not be imposed in the case of a mentally retarded youth. For the reasons which follow, we conclude that this assignment of error lacks merit.
Defendant was twenty years old at the time of the Earline Kidner's murder. He was arrested by the Harbor Police approximately two weeks after the offense, for possession of a sawed-off shotgun and two counts of resisting arrest. At the time of his arrest, he admitted to shooting up regularly over a seven month period with "T's and Blues." He has never had treatment for his drug habit; however, there was no evidence that he was under the influence of narcotics or dangerous drugs at the time of the offense.
Defendant's criminal record revealed several juvenile arrests and five adult arrests prior to the instant offense. Of the adult arrests, he sustained two misdemeanor convictions (Theft by Shoplifting and Simple Battery) and one felony conviction (Simple Burglary). He was sentenced to eighteen months in the Louisiana State Penitentiary for the Simple Burglary conviction, and he was subsequently released on good time.
Lindsey has spent most of his life in the Fischer Housing Project. Lindsey's father testified that he had twelve children, three with Lindsey's mother. (Lindsey's mother did not testify; however, it appears that she had three children in addition to those fathered by Lindsey's father.) His mother and father were never married, although they lived together for approximately 17 years. Defendant was shuffled back and forth between his parents beginning at age five. His mother worked, so he was largely supervised by his older siblings. He has never been married, but has one child. He has a sporadic and limited work history. He worked briefly as a dishwasher and on other occasions for his father who is a carpenter.
Defendant began attending special school in the third grade. He dropped out of school when he was fourteen. In 1981, following his first conviction, defendant was examined by two psychiatrists, Arneson, M.D. and DeVillier, M.D. Both psychiatrists found defendant to have an I.Q. below 70, somewhere in the 50 to 60 range. Both physicians agreed that defendant was retarded, with Dr. DeVillier classifying the defendant as mildly to moderately retarded. Both found that the defendant was able to distinguish right from wrong, could adhere to the right and could cooperate intelligently in his own defense. Dr. Arneson noted that the defendant was prone to violent antisocial behavior.
Dr. Ritter testified on defendant's behalf at the sentencing trial. He stated that he had examined the defendant in April of 1984 and again in April of 1987, one week before the sentencing hearing. Ritter stated that the defendant was mildly retarded with an I.Q. of 65. He classified the retardation as a mental defect and concluded that the defendant had a diminished capacity to appreciate the criminality of his conduct; however, he did not form an opinion as to defendant's capacity to follow the law and refrain from unlawful conduct at the time of the offense. Ritter explained that defendant had a "diminished capacity" to appreciate his own role in life, that one with such capacity is "impulsive, primitive, impaired socially" and "impaired economically;" they are unable to "absorb the nuances in their environment." Ritter's diagnosis was that the defendant was mentally retarded and that he committed antisocial acts.
On cross-examination, Ritter was questioned regarding the 1981 examinations by Arneson and DeVillier and their conclusions that the defendant could indeed distinguish right from wrong. Ritter responded that the defendant had a "diminished" capacity to distinguish right from wrong because of retardation. Ritter also stated that he did not go over the facts of this murder case nor did he listen to the defendant's statement because neither was relevant to determining the ability of the defendant to distinguish right from wrong.
During closing argument, defense counsel stressed as mitigating circumstances parental neglect, mental retardation and *907 the defendant's youth. She relied on Dr. Ritter's classification of mental retardation as a mental defect and argued the statutory mitigating circumstance of "extreme mental or emotional disturbance." The State, on the other hand, stressed that the 1981 reports, prepared by two other psychiatrists, reflected that defendant could indeed distinguish right from wrong, and argued that defendant was merely a "slow learner." The State noted that defendant ran from the scene of the crime, lied to the police, and stated that he "can't go beaten no murder charge."
As indicated in the discussion of Assignment of Error # 11, supra, Louisiana does not apply a balancing of aggravating and mitigating circumstances in the capital sentencing scheme. We have no way of determining what particular mitigating circumstances were dispositive in the jury's conclusion that defendant should receive the death sentence. The jury's determination does not require a listing of the mitigating circumstances considered. Defendant had the opportunity to present evidence to the jury in support of his argument that his capacity to appreciate the criminality of his conduct or to conform to the requirements of law was impaired as a result of a mental defect. As indicated above, Dr. Ritter testified on defendant's behalf and defense counsel made the argument in her opening and closing statement. In spite of these claims, the jury recommended the death sentence.
This court has affirmed the death sentence where evidence of comparable or more severe retardation was present in the record. State v. Welcome, 458 So.2d 1235 (La.1983); State v. Prejean, 379 So.2d 240 (La.1980); State v. Brogdon, 457 So.2d 616 (La.1984). Also, the U.S. 5th Circuit Court of Appeals has rejected the argument that the death penalty is excessive for those who are mentally retarded. Brogdon v. Butler, 824 F.2d 338 (5th Cir.1987); Penry v. Lynaugh, 832 F.2d 915 (5th Cir.1987), cert. granted, ___ U.S. ___, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988).
"A killing to overcome the victim's resistance to armed robbery is the type of crime which creates abject terror among law-abiding citizens." State v. Kyles, 513 So. 2d 265, 276 (La.1987). This Court has consistently affirmed the death penalty in other single-shot armed robberies. State v. Wingo, 457 So.2d 1159 (La.1984); State v. Glass, 455 So.2d 659 (La.1984); State v. James, 431 So.2d 399 (La.1983); State v. Messiah, 538 So.2d 175 (La.1988); State v. Thompson, 516 So.2d 349 (La.1987); State v. Knighton, 436 So.2d 1141 (La.1983); State v. Ford, 489 So.2d 1250 (La.1986); State v. Kyles, supra.
Accordingly, the death sentence in this case is not disproportionate; and, after considering both the crime and the defendant, we conclude that the capital sentence is neither Constitutionally excessive, nor cruel and unusual punishment.

DECREE
For the reasons assigned, defendant's conviction and death sentence is affirmed, except that this judgment, shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until:
(a) defendant fails to petition the U.S. Supreme Court timely for certiorari;
(b) that court denies his petition for certiorari;
(c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under the prevailing Rules for rehearing of denial of certiorari; or
(d) that court denies his application for rehearing.
CONVICTION AND SENTENCE AFFIRMED.
DENNIS, J., concurs with reasons.
DIXON, C.J., dissents from the death sentence for this young retarded defendant, otherwise, concurs.
NOTES
[1] The jury found three aggravating circumstances: (1) the offender was engaged in the perpetration of armed robbery; (2) the offender knowingly created a risk of death or great bodily harm to more than one person; and (3) the crime was committed in an especially heinous, atrocious or cruel manner.
[2] In Assignment of Error # 12, defendant requests that this court examine the record for errors patent. It is the policy of this court in capital cases to consider arguments which should have been raised in the trial court but were not. State v. Clark, 492 So.2d 862, 865 (La.1986). Also, assignments of error neither briefed nor argued are reviewed in this court as a matter of policy in cases where the death penalty is imposed. State v. Lindsey, 404 So.2d at 478.
[3] In the first review of this very case, this court addressed defendant's arguments that his motion to suppress had been erroneously denied because the statements were not free and voluntary and, alternatively, that they were the product of an unlawful arrest. Responding to the defendant's assertion that the statement was not voluntary because of his diminished mental capacity, this court concluded that "the totality of the circumstances demonstrated that defendant's statements were voluntarily and intelligently made after a waiver of known constitutional rights." State v. Lindsey, 404 So.2d at 472, 473.
[4] This court reviewed defendant's allegations that the trial court committed reversible error in allowing the introduction of S-1 and S-3 following defendants's first trial. In weighing the probative value of the photographs toward proving the identity of the murder victim, with the small likelihood that the jury was inflamed simply upon seeing the pictures, this court concluded that the probative value of the photographs outweighed the possible inflammatory effect. State v. Lindsey, 404 So.2d at 476.
[5] La.C.Cr.P. Art. 798(2) states: "It is good cause for challenge on the part of the state, but not on the part of the defendant, that: ... the juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt."
[6] In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that a capital defendant's right, under the Sixth and Fourteenth Amendments, to an impartial jury prohibited the exclusion of venire members simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. The Court concluded that the exclusion of venire members must be limited to those who were "irrevocably committed... to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings," and to those whose views would prevent them from making an impartial decision on the question of guilt.
[7] See footnote # 6.
[8] In Perry, this court held that there is no merit to a defendant's argument that his constitutional right to be tried by a jury selected from a fair cross-section of the community has been violated when prospective jurors have been properly excluded in compliance with La.Code Crim.P. art. 798(2) and Witherspoon v. Illinois, supra.
[9] Art. 797. Challenge For Cause "The state or the defendant may challenge a juror for cause on the ground that: (1) The juror lacks a qualification required by law; (2) The juror is not impartial, whatever the cause of his partiality.... (3) The relationship, ..., between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that that it would influence the juror in arriving at a verdict; (4) The juror will not accept the law as given to him by the court; or (5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense."
[10] Prospective juror, Bickham, responded that he did expect to hear a case from the defendant. This response was erroneously credited to Camp. Bickham later stated that he could deliberate impartially regardless of whether or not the defendant testified. Bickham served on the jury; Camp was excused.
[11] John Knoph was a key witness for the State. He was present at the scene of the shooting and chased the defendant until the defendant pointed a gun at him. His photographic lineup identification of the defendant led to his arrest.
[12] In State v. Albert, supra, the District Attorney told prospective jurors that "this will be the second or third trial involving the particular incidents involving (the victim)." This court held that, because the remark did not pin-point the defendant and there was no reference to a conviction, any prejudice resulting from this "vague remark" was not sufficient to prevent a fair trial.
[13] Beckendorf was a police officer in the Jefferson Parish Sheriff's Office for nine years. During that time, he was in charge of the robbery division, and he participated in the investigation of the homicide at the Oakwood Shopping Center. On January 3, 1980, Beckendorf spoke to the defendant and elicited from him a statement regarding his participation in a scheme to rob Oakwood Shopping Center patrons of money for drugs.
[14] These articles respectively provide that a unanimous recommendation is required for the imposition of the death sentence and specify the form of the jury's recommendation. Effective July 18, 1988, the word "recommendation" in La.C.Cr.P. arts. 905.6 and 905.7 is replaced by the word "determination."