BROWN, Chief Judge.
11 Defendant, John G. Cross, was convicted by a unanimous six-person jury of arson with intent to defraud, a violation of La. R.S. 14:53. Defendant was adjudicated a second-felony habitual offender and sentenced to 10 years’ imprisonment at hard labor. He was also ordered to pay a $2,000 fine and make restitution to the victim in the amounts of $1,355 and $750. Defendant now appeals. As the $2,000 fine was not authorized under La. R.S. 15:529.1, defendant’s sentence is amended to delete the fine. Otherwise, defendant’s conviction and sentence, as amended, are affirmed.

Facts

Defendant was arrested and charged with simple arson which caused damage in excess of $500, a violation of La. R.S. 14:52, for his actions on or about September 10, 2008. The bill of information was amended just before trial to charge Cross with arson with intent to defraud, a violation of La. R.S. 14:53.
*997 James Carroll testified that in September 2008, he and his wife lived at 1577 South Blankston Road in Caldwell Parish. The house and garage were protected by a security system that required either an entry code or a remote control for entry. The electrical panel for the home was in a closet located inside the garage.
Carroll had known defendant for over a year, beginning when defendant bought hay from Carroll, who owns a farm and sells hay to the public. Carroll talked with defendant and discovered that he was a carpenter by trade and also did handyman work. Defendant performed some work for Carroll.
| Jn September 2008, Carroll, who was an attorney, attended a seminar in Denver, Colorado. The seminar was from September 9 to 11. He arranged for his secretary to stay at his home at night to care for his dogs in the evenings and mornings. He asked defendant to resolve some plumbing problems at the home while he and his wife were in Colorado. Carroll said that there was a water leak between his tub and shower, and his tankless water heating system was not working efficiently.
After arriving in Denver, Carroll received a phone call from his secretary, Daidre Boulton, who related that Century-Tel had called to advise her that the Car-rolls’ home security system was not functioning. Ms. Boulton was told that the breaker needed to be flipped, ■ and she needed Carroll to tell her where the breaker box was located. Ms. Boulton called Carroll back to tell him that when she arrived at his home that evening, neither the security system nor the air conditioning was working. Carroll asked Ms. Boul-ton to have defendant look at both the air conditioning and the security system. They agreed that she would stay at her own house that night and return the next morning to tend to the dogs.
The next day defendant called Carroll to tell him that his house had been damaged by a power surge or struck by lightning. Defendant told Carroll that the electrical wires in the attic had gotten so hot that a fire had erupted. Carroll told defendant to do whatever was necessary to make the house safe. Defendant told him that the installed electrical panel was not of the grade and quality appropriate for the amount of electricity going into the house. Defendant said that he needed $750 to get started on replacing the |selectrical panel. Carroll had his brother get the money to defendant. Carroll’s dad spoke with defendant about the problems and then advised Carroll that he did not need to return early because the issues were being handled.
Upon Carroll’s return from Denver, defendant showed him the damage in the attic, where the electrical wires were split and charred. Defendant said this was where the fire occurred. Defendant also showed Carroll another spot in the attic where a stud had actually caught fire. The electrical panel that defendant had removed had also been burned and had been sprayed with some type of-silver paint. A new electrical box was already installed when Carroll returned, and defendant was in the process of hooking up the wires. Defendant said that the lightning must have hit the wires where they come into the house from the street.. Defendant said that the lightning degraded the electrical wires in the entire house, causing the air conditioning and security system to malfunction. Defendant advised that all the wires in the house should be replaced.
Carroll, had last observed the electrical box a few weeks before his trip when a hair dryer and curling iron had tripped the breaker. He did not see or smell anything that would indicate a problem with the *998 electrical system. He last went into the attic in June or July of 2008, when Jeff Wyant, an electrician, had informed him that a bulb needed to be replaced.
Defendant also showed Carroll damage where the electricity comes out of the meter box and into the house. Defendant told him that the lightning probably hit his house and caused the damage because he did not [4have a lightning rod in place to ground the house. Defendant said that all the wiring in the house would have to be replaced at a cost of $20,000-$22,000.
Carroll shared the story of his house damage with his Sunday School class the next morning and David Wilson, a licensed contractor, approached Carroll after the class to say that the story did not sound right. Wilson brought his electrician, Jeff Wyant, to the house to view the damage. After viewing the damage, Wyant said that defendant’s opinion that lightning caused the damage made no sense. Wyant testified that he also examined the damaged breaker box and the damage to the outside of the house and suggested that Carroll call the state police and report defendant because the house had not been hit by lightning. Furthermore, Wilson and Wyant showed Carroll that he did have a lightning rod, and from its condition it had been there for a long time.
After Wilson and Wyant left, defendant returned to the Carroll home and again told Carroll that he did not have a lightning rod. When Carroll said that he was going to report the damage to the insurance company for payment, defendant told him not to because the insurance company would not be responsible for the damage if he did not have a lightning rod. When Carroll said that he still planned to report the damage to the insurance company, defendant said that he would install a new lightning rod before the insurance agent arrived for inspection. Carroll told defendant “no.”
At this point defendant told Carroll that he would rewire the house for whatever amount of money the insurance company paid him for the damage. Ijf the insurance company paid more than the $22,000 he said he would let Carroll keep it and if they paid less, that would be his charge.
Carroll confirmed that the only way to access the attic was by going through the secured garage. He also confirmed that the only people who could have had access to the house at that time were himself, his wife, his dad, his secretary and defendant.
Carroll paid $1,295 to David Wilson to have the electrical equipment repaired, $80 to CenturyTel to have the security connection re-established, and had to reimburse his brother for the $750 his brother had given to defendant.
Daidre Boulton, Carroll’s secretary, testified that she has been with his firm for six years. She sometimes house sits for the Carrolls when they are away and she cares for their animals. In September 2008, Carroll asked her to stay at his home while he and his wife were in Denver. He told her that defendant would be coming to the house for some work while they were out of town.
On the Tuesday that the Carrolls left, Ms. Boulton arrived at the Carrolls’ home early that evening after work. Defendant had already been there working. The air conditioning was not working and the house was hot. CenturyTel called to advise her that the house security system was not functioning properly and suggested that perhaps the breaker had flipped. Ms. Boulton called Carroll to find out where the breaker box was located and also to tell him that the air conditioning was out so she would not be |fiable to stay there. However, it turned out that no *999 breakers were flipped and neither the air conditioning nor the security system could be restored.
On Wednesday, Ms. Boulton let defendant into the house before leaving for work. Later that day she delivered an envelope from John Carroll, her employer’s brother, to defendant. That evening, defendant showed her the burnt wiring and the meter downstairs, but she refused to go into the attic. Defendant told her that the meter was not grounded.
David Wilson, a general contractor with a commercial license, testified that in 2008 he had known Carroll about five years. Carroll had been told that his house had been struck by lightning, the house lacked a grounding rod, and the repairs would be costly. Wilson walked around the house and observed the attic and the electrical panel. He noticed that the damage to the electrical panel did not look the way it usually would if it had gotten hot from the inside. In the attic he saw that a roof brace was burned where many of the main electrical wires pass by it. The outsides of the wires were blackened, but upon further examination, Wilson noted that the wires were not damaged.
Wilson was uncomfortable with his findings, so he brought in his electrical subcontractor, Jeff Wyant, to review the damage. Wyant came to the same conclusion that Wilson did, that the damage did not reflect that the house had been hit by lightning.
Wilson said that electric companies will not hook up electricity to a new home or for a remodel if there is no grounding rod in place for 17protection. Carroll’s house had a grounding rod, properly installed and hooked up to the electrical system.
Wilson subcontracted the electrical repairs for Carroll’s house to Wyant. The cost to restore electricity to Carroll’s house was $1,295.
Jeff Wyant, a licensed electrician, testified that Wilson asked him to address an electrical problem at Carroll’s house. He saw that the prior electrical breaker box had been removed and sprayed with paint. Another electrical breaker box had been installed in its place, but was not yet hooked up.
Wyant’s examination of the previous breaker box revealed that the wires were cut and had burn marks on the outside of the plastic covering. Wyant said that the burns on the outside of the wire ruled out lightning or an electrical problem as the cause, because the damage was not consistent with those as sources. Lightning or an electrical surge would have left burns on the busbar, where the head load is located, heated the copper or aluminum electrical wires as it passed through, causing the outer plastic coating to melt from the inside and stick to the wires, and heated the grounding wire to the point of discoloration. No such damage had occurred there. Wyant believed that the damage was caused by a flame.
The damage to the meter also ruled out lightning or an electrical problem, as the damage there was also inconsistent with those causes. Wyant stated that the meter lugs would have shown damage from heating and the coating on the electrical wires would have melted off, exposing the interior wire. No such damage was seen there; instead, there was only |scharring on the outside of the plastic coating the wires, which Wyant said indicated that the damage was caused by an external flame or torch.
Wyant found the same damage to the electrical wires in the attic. There was evidence that heat had been applied to the surrounding insulation. The only smell he detected was that of melting plastic. Wyant said that he had seen Carroll’s electrical system about a year before this *1000 electrical problem, and he did not see any of the current burning and scorching. Wyant said that the damage he observed was staged and not caused by lightning. Also, he said that Carroll did in fact have a grounding rod that was hooked up.
Lt. Rick Abbott, a Fire Marshall with the Louisiana State Police, was accepted by the trial court as an expert in arson investigation. His investigation revealed fire damage to the outside electrical meter base, the inside of the breaker box, the wiring in the attic and an attic support brace.
Abbott also found the evidence to be inconsistent with having been caused by lightning or an electrical surge. The meter showed no signs of charring or melting and instead was discolored in a way that Abbott said was caused by an open flame. The breaker box door was not damaged. He stated that the damage to the breaker wires and fuses was caused by an exterior flame being held up to those objects.
The pattern of an external heat source continued in the attic, where Abbott found sooty burns on a support stud. Abbott said that one could obtain similar results by holding a cigarette lighter to a piece of wood. Again, the damage was inconsistent with being caused by an interior heat | cisource, such as overheated copper wires, as this would have caused the outer plastic covering to melt from the inside. Instead, the evidence indicated that only exterior heat had been applied to the outside of the wires. Abbott said that the evidence indicated that the fire damage to Carroll’s electrical system was not caused by lightning or any other natural cause, and was not precipitated by an electrical fire. Abbott said that he found the grounding rod had been properly installed. He was unable to determine how long the damage had been there.
Abbott said that someone used an external flame source to actually set fire to these objects to the extent that they burned. He opined that this person intended to simulate an electrical malfunction which would cause the homeowner to think that the wiring malfunctioned. Abbott felt that defendant caused the damage with the intent to defraud Carroll because of defendant’s physical access to the damaged items and his claims that the damage was caused by lightning, when the evidence indicated otherwise.
The prosecution rested. Defendant did not testify and the only witness called by the defense was Dr. Eldredge Carroll, Jr., James Carroll’s father. Dr. Carroll testified that his son called and asked him to check on an electrical problem at his house. Defendant showed Dr. Carroll the electrical breaker box and the outside meter box. Dr. Carroll did not go into the attic, and said he did not remember defendant telling him that there was damage in the attic. Defendant told him that the breaker box had been hooked up incorrectly and a short occurred, which resulted in a fire in the breaker box. | inDefendant told him that had the problem not been caught, the house would have burned down within 24 hours.
Dr. Carroll said he was not surprised that there could be an electrical problem, because of prior problems discovered with the carpentry and roof. He felt that the subcontractors had been sloppy.
The six-person jury returned a unanimous verdict of guilty as charged of arson with intent to defraud. Defendant was adjudicated a second-felony habitual offender and sentenced to 10 years’ imprisonment at hard labor. The court also ordered defendant to pay a $2,000 fine plus costs, and restitution to Carroll in the amounts of $1,355 and $750. Defendant’s *1001 motion to reconsider sentence was heard and denied.

Discussion

Defendant was convicted of arson with the intent to defraud, which is the setting of fire to, or damaging by any explosive substance, any property, with intent to defraud. La. R.S. 14:53. Even slight damage to property, such as scorching, is sufficient to support a conviction for arson. State v. Smith, 43,291 (La.App.2d Cir.08/13/08), 988 So.2d 861. Therefore, the state had the burden to prove beyond a reasonable doubt two facts: (1) that defendant committed the act of arson on Carroll’s electrical system; and (2) that defendant committed such arson with the intent to defraud.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La. App.2d Cir.01/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/06/09), 21 So.3d 299.
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Davies, 35,783 (La.App.2d Cir.04/05/02), 813 So.2d 1262, writ denied, 02-1564 (La.05/09/03), 843 So.2d 389.
^Testimony revealed that defendant had developed a friendly business relationship with Carroll. Defendant had established himself with Carroll as a handyman, capable of dealing with complicated problems. When Carroll sought to have work done in his home while he was away, defendant relied on this, confidence to create the illusion of an electrical malfunction.
The' evidence shows that when Carroll left for Colorado there was no problem with the electrical, air' conditioning, or security systems. The problems with the air conditioning and security systems did not occur until after Carroll and his wife left the state and before Ms. Boulton arrived after work the first- day of her employer’s trip. Access to the garage, where both the electrical breaker box and the access to the attic were located, was protected by the arming of the security system prior to the Carrolls’ departure. Between that time and Ms. Boulton’s arrival on Tuesday, the only person known to be at the Carroll residence was defendant, who was supposed to be working on the tub leak and *1002 the water heating system. Ms. Boulton arrived to find that neither the air conditioning nor the security system worked.
Defendant told Carroll and Boulton that the electrical breaker box was insufficient to bear the house’s electrical load and because there was no grounding rod in place, an electrical surge or lightning had degraded all the electrical wires in the house. Defendant emphasized that the situation was very dangerous, that the house could have burned down, and that the breaker box and all the electrical wires in the house had to be replaced. He 113told Carroll that he needed $750 up front to replace the breaker box and the cost to repair the electrical wires would run $20,-000-$22,000.
The testimony of the general contractor, the electrician, and the arson investigator contradicted defendant’s story. They found no evidence at the Carroll home to support defendant’s story that the damage was caused by either lightning or an electrical surge. Instead, they concluded that someone intentionally applied a flame or torch to the outside of the electrical wires in the meter, in the breaker box, and in the attic. Abbott, an arson investigator, testified that someone intentionally set fire to those objects in a manner intended to make the homeowner believe that the electrical system had malfunctioned. The testimony indicated that defendant had the access and opportunity to cause the damage, and that only defendant stood to benefit from it. Furthermore, he lied about there being no grounding rod at the Carroll home.
Defendant’s actions in attempting to lead Carroll to believe that he had no grounding rod, that the home had been damaged by lightning or an electrical surge, and that he needed to spend over $20,000 to restore his electricity and prevent his home from burning was nothing more than a confidence game meant to defraud Carroll and if necessary, Carroll’s insurance carrier. The evidence was sufficient for the jury to rationally conclude that defendant committed arson with the specific intent of defrauding Carroll.

Excessive sentence

As noted above, the trial court found that defendant was a second-felony habitual offender and sentenced him to 10 years’ imprisonment at |uhard labor, plus ordered him to pay a $2,000 fine and make restitution to the victim. The trial court noted that the pre-sentence report showed that defendant had four prior felonies and over 20 arrests in six different states, including 14 for burglary. The court also observed that defendant was presently charged in Ouachita Parish with felony theft in a remodeling scheme. At the time of the present crime, defendant was on probation for a possession of cocaine conviction. The trial court found and the record supports that defendant was persistently involved in defrauding others. Defendant’s sentence is not excessive.

Error patent

The habitual offender statute does not provide for imposition of a fine. State v. Dickerson, 584 So.2d 1140 (La.1991). Even though the underlying statute providing the basis for defendant’s conviction may authorize the imposition of a fine, the enhancing statute does not. State v. Ealy, 44,252 (La.App.2d Cir.05/13/09), 12 So.Sd 1052, unit denied, 09-1393 (La.02/05/10), 27 So.3d 298. Because the trial court was without authority to impose such a fine, a fine imposed in sentencing a habitual offender is illegal and should be deleted. State v. Cass, 46,228 (La.App.2d Cir.04/13/11), 61 So.3d 840, writ denied, 11-1006 (La.11/04/11), 75 So.3d 922.

*1003
Conclusion

For the foregoing reasons, defendant’s sentence is amended to delete the $2,000 fíne. As amended, the conviction and sentence are affirmed.